444 F.3d 255
 Melissa JENNINGS, Plaintiff-Appellant, and
Debbie Keller, Plaintiff,
v.
UNIVERSITY OF NORTH CAROLINA, AT CHAPEL HILL; Anson Dorrance, individually and as women's soccer coach at UNC; William Palladino, individually and as assistant women's soccer coach at UNC; Chris Ducar, individually and as assistant women's soccer coach at UNC; Bill Prentice, individually and as athletic trainer at UNC; Michael K. Hooker, individually and as Chancellor at UNC; Susan Ehringhaus, individually and as assistant to the Chancellor at UNC; Richard A. Baddour, individually and as Director of Athletics for UNC; Beth Miller, individually and as Senior Associate Director of Athletics at UNC; John Swofford, individually and as former Director of Athletics for UNC; All Defendants, Defendants-Appellees.
 No. 04-2447.
 United States Court of Appeals, Fourth Circuit.
 Argued September 19, 2005.
 Decided April 11, 2006.
 
 1
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED ARGUED: Daniel Francis Konicek, Konicek & Dillon, P.C., Geneva, Illinois, for Appellant. Thomas J. Ziko, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellees. ON BRIEF: Jeffrey T. Mitchell, Konicek & Dillon, P.C., Geneva, Illinois, for Appellant. Roy Cooper, North Carolina Attorney General, Joyce S. Rutledge, Assistant Attorney General, Raleigh, North Carolina; Douglas E. Kingsbery, Tharrington, Smith, L.L.P., Raleigh, North Carolina, for Appellees.
 
 
 2
 Before WILLIAMS and MICHAEL, Circuit Judges, and JAMES C. DEVER III, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 
 
 3
 Affirmed by published opinion. Judge DEVER wrote the majority opinion, in which Judge WILLIAMS joined. Judge MICHAEL wrote a dissenting opinion.
 
 OPINION
 
 4
 DEVER, District Judge.
 
 
 5
 In this case we examine whether Anson Dorrance and William Palladino (the male coaches of the women's soccer team at the University of North Carolina at Chapel Hill) sexually harassed Melissa Jennings while Jennings was a student and soccer player at the University from August 1996 until May 1998. Jennings seeks to hold the University liable under Title IX, Dorrance, Palladino, and various University officials liable under 42 U.S.C. § 1983, and Dorrance liable under state law. The district court rejected Jennings' claims and granted the defendants' motion for summary judgment. On appeal, Jennings argues that she is entitled to have a jury determine all of her claims, including her claim that Dorrance created a sexually hostile environment.
 
 
 6
 Laws prohibiting sexual harassment are designed to protect people at work and at school from the kind of extreme conduct that can make work or school hellish because of the person's sex. The laws, however, are not designed to purge or punish all vulgarity at work or in universities. Whether conduct constitutes actionable sexual harassment cannot be divorced from the context in which the alleged harassment arose. Thus, a court evaluating a sexual harassment claim must examine the constellation of surrounding circumstances, expectations, and relationships.
 
 
 7
 When the evidence in this case is viewed most favorably to Jennings, the evidence shows that Dorrance used vulgar language and participated in sexual banter at practice with some women that he coached and that he once directed a vulgar question at Jennings. Jennings immediately responded to Dorrance's vulgar question with her own profane reply and that ended the inquiry. Dorrance never touched, never threatened, never ogled, and never propositioned Jennings. Because no reasonable jury could find that Dorrance sexually harassed Jennings or find that Jennings' other claims have merit, we affirm the judgment of the district court.
 
 I.
 
 8
 Anson Dorrance ("Dorrance") has served as head coach of the women's soccer team at the University of North Carolina at Chapel Hill ("University") since 1979. William Palladino ("Palladino") has served as the team's assistant coach since 1980. JA 336. Jennings ("Jennings" or "plaintiff") was a member of the women's soccer team and a student at the University from August 1996 until May 1998.
 
 
 9
 From August 1996 through May 1998, the women's soccer team consisted of approximately 26 members. See JA 930. Some of the women were on soccer scholarships and some were not. Jennings was a third-string or fourth-string goalkeeper. JA 182. She was recruited as a walk-on, and never was on scholarship. JA 181.
 
 
 10
 The regular season for women's college soccer is in the fall. During 1996 and 1997, except on game days, soccer practice for the University's team was every afternoon during the week and on Saturday morning. JA 1042-43. Before soccer practice formally began each day, the women on the team customarily warmed-up, ran a lap, and stretched in small groups within a large circle for approximately ten to fifteen minutes. JA 1046-47. These warm-ups were casual and informal, and while stretching, the team members regularly talked and joked among themselves about non-soccer related topics, such as homework, social activities, and their personal lives (including dating and their sex lives). JA 1047-53. Debbie Keller (a 1996 team captain) described this as a time "at the beginning of practice to talk about our day and then get serious for practice." JA 1044. In terms of who talked about their personal lives during warm-ups, Keller described some women on the team "being very wide open about [their] personal li[ves]," others being in an intermediate group, and others being reserved. JA 1053-56. Jennings testified that she did not participate in any of the players' discussions about their sexual activities. JA 1242-43, 1585.
 
 
 11
 Dorrance and Palladino would participate in these conversations during warm-ups, although witnesses describe the extent of their alleged participation differently. According to Keller, Dorrance and Palladino would walk through the large circle once or twice a week while the team was stretching and tease and joke around with team members about various topics, including who the players were dating and about their evenings the night before. JA 1057-59, 1061. Palladino would "generally laugh and listen." JA 1059; see also JA 1060-61. According to Keller, Dorrance "occasionally" would teasingly inquire about who a player was dating and about a player's sex life, but Dorrance did not make comments about personal dating or sex lives every time that he walked through the circle. JA 1066-68. Keller also stated that Dorrance sometimes would ask some team members if they had been out drinking or would ask about team members' families. JA 1067.
 
 
 12
 Amy Steelman, who was on the team from the fall of 1995 through the fall of 1996, submitted a declaration stating that "[w]hen Anson Dorrance was around, he would encourage and participate in sexual discussions, sexual jokes, sexual talk, sexual banter, and sexual innuendos. A typical Monday afternoon included queries and discussions with Anson Dorrance into the team members' sexual ... exploits...." JA 1452. Steelman's declaration does not mention Palladino. See id.
 
 
 13
 According to Jennings, Dorrance would frequently participate in conversations at practice about players' personal lives, including their dating and sex lives. JA 1238-45, 1281-83, 1585. Dorrance allegedly would ask some team members with whom they were sleeping and encouraged discussion on other related topics. See JA 1452. Dorrance's remarks were often crude. For example, one player informed the team that she had had sex with one man, climbed out of his window, and then climbed into the window of another man's apartment to have sex with him. JA 1055, 1058. Dorrance was present and asked the player if she knew her sexual partners' names or whether she took tickets. JA 1236. He also referred to this player's sexual partner as the "f* * * of the week." JA 1237.[1] In addition, according to Jennings, Dorrance would sometimes make comments about team members' bodies, including comments about team members' weight, legs, or chests. JA 1275-79. For example, Dorrance once said that a "top heavy" woman has a more difficult time playing soccer, and once described a woman's chest as her "rack." See JA 1236. Dorrance called another player "fat a* *," JA 1228, told another player she had nice legs, (JA 1233), and commented on another players's "cute dimples," JA 1229. As for Palladino's conduct, Jennings testified that Palladino was present while Dorrance made comments, and "didn't do anything to stop it." JA 1291.[2]
 
 
 14
 Jennings also testified that while coaching the team in 1996 and 1997, Dorrance used profanity, including using the words "f* * * " and "unf* * *ingbelievable" and the phrases "what the f* * *," "f* * *ing brilliant," and "f* * *ing stupid." JA 1231-33, 1264-65, 1452. For example, he would use such phrases when he believed that a player was out of position or made a poor pass. JA 1231. Dorrance admits that he sometimes used the word "f* * *" while coaching. JA 835.
 
 
 15
 As for comments that Dorrance directed at Jennings during practice during her two years on the team, Jennings testified that Dorrance never made any inappropriate comments about her body. JA 1243. Jennings also admits that Dorrance never threatened her, never touched her, never ogled her, and never propositioned her. She did testify, however, that she could recall two incidents during her two-year tenure on the team where her personal life was mentioned at practice. First, Jennings testified that on one occasion during her sophomore season (i.e., 1997) prior to one practice, she and some teammates were sitting on some benches near the soccer practice field with Dorrance nearby. JA 1252-54. Dorrance asked one of the players whether her weekend visit with her boyfriend had been a "shag fest." JA 1249. The teammate, who apparently knew that Jennings had gone to visit her boyfriend at a different university the previous weekend, attempted to involve Jennings in the conversation, asking "What about Trim'n?"[3] JA 1246-48, 1252. According to Jennings, Dorrance "chimed in," asking either "So Trim'n[?]" or "yes, what about Trim'n?". JA 1246, 1252. Jennings ignored the comments of her teammate and Dorrance and walked to the practice field to do "goal-keeper stuff." JA 1255. Second, during stretching prior to practice, one of Jennings' teammates once asked her whom she was dating. The teammate commented that Jennings had talked to a male after the previous day's game and the teammate wanted to know if the male was a boyfriend or just a friend. JA 1257-59. Jennings responded that the male was just a friend. JA 1258. The teammate teased Jennings and said that he looked like more than a friend given that Jennings hugged him. Id. Dorrance and Palladino were present during this conversation between Jennings and her teammate, but Jennings does not remember whether Dorrance or Palladino said anything. JA 1258-60.
 
 
 16
 Beyond these two incidents, Jennings also complains that during a water break at practice, Jennings overheard Dorrance and Bill Prentice (a University athletic trainer) speaking. They were not speaking to Jennings. According to Jennings, Dorrance and Prentice made a comment which included the phrase "Asian threesome." Jennings interpreted the comment to be a description of a fantasy involving two teammates and one of the men. JA 1284-86. After the phrase "Asian threesome" was used, Jennings overheard Dorrance "kind of chuckle" and say "oh, yeah." JA 1285. That was the only time that Jennings heard Dorrance use the phrase "Asian threesome." JA 1286.
 
 
 17
 During the fall of 1996, Jennings met with Susan Ehringhaus, then Assistant to the Chancellor and Senior University Counsel. JA 1337-39, 1341. Jennings told Ehringhaus about a number of things relating to Dorrance including: (1) Dorrance failing to come visit Jennings in the hospital when she got sick during the fall of her freshman year (JA 1335); (2) Dorrance failing to tell the team that Jennings was in the hospital with an illness during the fall of her freshman year as an explanation for why Jennings missed a game (JA 1338, 1340); (3) Dorrance directing Jennings to buy Gatorade for the team and the team's opponent due to a disruption of water supply in Chapel Hill arising from Hurricane Fran and then not reimbursing Jennings (JA 197, 1340-41, 1344-45, 1350); (4) Dorrance encouraging Jennings to attend parties where teammates were present even though Jennings told him that she did not want to attend because she was underage and some women were drinking alcohol at the parties (JA 198, 1338-40, 1347-48); and (5) Dorrance making sexual comments at practice, such as asking a team member who is "shacking up" and asking another teammate who a team member's "f* * * of the week" is (JA 1341-44). During the conversation, Ehringhaus tried to get an understanding of the context of Dorrance's alleged conduct and comments. JA 1339-41, 1347. Jennings never told Ehringhaus that the sexual comments were directed at her. JA 1346-47. Ehringhaus encouraged Jennings to talk with Dorrance about all of these issues. JA 1342-44.
 
 
 18
 Later in the fall of 1996, Jennings again met with Ehringhaus and spoke to her about getting reimbursed $400 for buying the Gatorade. JA 1344-46. During that meeting, Jennings did not mention anything about sexual comments at practice. JA 1345-46. After that meeting, Craig Jennings (plaintiff's father) wrote a letter to the University about reimbursing his daughter for the Gatorade purchase. JA 1352-53, 1411. The letter said nothing about sexual comments at practice. Thereafter Dorrance reimbursed Jennings for buying the Gatorade. JA 1350-51.
 
 
 19
 Women's college soccer culminates in a tournament for the national championship. In December 1996, the soccer team was in California for the Final Four. JA 1305. According to Jennings, that weekend Dorrance individually met with each player (including Jennings) in his hotel room for a routine end-of-year meeting. JA 1305-08. Jennings understood the meeting's purpose was to give each player a performance evaluation as an individual player, a student, and a team member. JA 1321-22.
 
 
 20
 After the player before Jennings had finished her meeting with Dorrance, Dorrance told Jennings to come in and have a seat at a table in his hotel room. JA 1308-09. Dorrance also took a seat at the table. JA 1311-12. After some small talk, Dorrance talked about Jennings' need to improve her grades because her grade point average ("GPA") was below 2.0 on a 4.0 scale. JA 1314-15.[4] Jennings believed that she was in danger of losing her athletic eligibility due to poor grades. JA 1315. Dorrance told Jennings that her grades were not acceptable and that she needed to bring them up. JA 1316. Dorrance then asked if she had been attending academic tutoring sessions. JA 1318. Jennings said that she had been attending the tutoring sessions. Id.
 
 
 21
 As part of the conversation about her grades, Dorrance then asked Jennings about whether her social life was adversely affecting her grades. JA 1329-30. As part of that inquiry, Jennings testified that Dorrance specifically asked Jennings, "Who are you f* * *ing?" and whether it was adversely affecting her grades. JA 1329-30.[5] Although Jennings testified that Dorrance used the word "f* * *" a lot during practice, the question took her aback. JA 1330-31. Jennings immediately told Dorrance that her personal life was "none of his g* * d* * * business." JA 1325-26, 1331.
 
 
 22
 Dorrance then immediately dropped the subject of her grades and social life and started speaking with Jennings about her performance as a player. JA 1327, 1333. Jennings had played in two games during the year, a preseason game and a game when the team was "winning by a lot." JA 1334. Dorrance spoke to her about her playing statistics and conditioning statistics and told Jennings that she needed to improve as a player and improve her conditioning. JA 1327-28. Thereafter, the meeting ended. JA 1328-29, 1333.
 
 
 23
 Jennings returned to the soccer team in the fall of 1997. JA 1356. Jennings played in one or two games. Id. At the end of the season in the fall of 1997, Dorrance again had one-on-one meetings with all of the players, including Jennings. JA 1360-61. The meetings took place at "the Hut," which is a trailer next to the soccer practice field. JA 964. In the meeting with Jennings, Dorrance noted that Jennings' grades had improved, but could be better. JA 1361-62.[6] Dorrance also told Jennings that she was not meeting the team standards for fitness and training or the team standards for contributing to positive team chemistry. JA 1362-63. Dorrance told Jennings that she was in danger of being cut from the team if her performance did not improve. JA 1363.
 
 
 24
 On May 5, 1998, Dorrance met with Jennings at the Hut. JA 1384, 183. Dorrance told Jennings that her fitness and conditioning statistics and her contributions to positive team chemistry were not at an adequate level and cut her from the team. JA 1387-90; see also JA 183, 282-84. Jennings is not the only reserve that Dorrance has cut from the team for failure to contribute to the team in two of the three areas in which reserve players are evaluated. JA 184.
 
 
 25
 Jennings testified that she was shocked and upset that she was cut. Up to that point, Jennings was happy with her performance on the team and believed she was improving. JA 1388. While on the team, Jennings never sought or received any psychological care or treatment. JA 1419-21, 656-67.
 
 
 26
 Craig Jennings (plaintiff's father) wrote Ehringhaus a letter dated May 12, 1998. JA 1543, 1551. Although Craig Jennings had complained in the fall of 1996 about the Gatorade incident and the presence of alcohol at parties, he now complained (for the first time) about questions and comments that Dorrance allegedly made at practice and during player reviews to women on the team about their personal lives. JA 1543, 1551. Craig Jennings' letter stated:
 
 
 27
 During the past few days, I have learned much more concerning Coach Dorrance's actions towards our daughter Melissa over the past eighteen months. Mrs. Jennings and I believe that you and Chancellor M. Hooker would find some of these actions just as repulsive and not representative of the UNC staff. Coach Dorrance has in every player/coach review (except the one last week) and at the practice field asked the following questions:
 
 
 28
 1. Who is your boy friend? Are you seeing anyone? What does he do? Are you enjoying the UNC campus? We personally do not find these questions totally offensive, but the answers are Melissa's to give, if she chooses without retribution.
 
 
 29
 2. When answering yes to a boy friend or after bringing friends to team activities he then has asked the following: Are you sleeping with him? Are you shacking up with him? We find both of these questions totally inappropriate and harassing!
 
 
 30
 3. The Monday practice session team question has been on numerous occasions: Who is shacking up with whom? He will even question roommates on the field about the exploits of their teammates?
 
 
 31
 4. To one team member (not Melissa), he asked the team who her S — for the week is/was? Like most of the team members, she can not respond because he totally owns her way through your fine institution and controls her ability to go to your school. This is the sickest form of harassment.
 
 
 32
 Items two through four above, we find extremely disturbing and completely inappropriate of any UNC staff member to ask a student, another UNC employee, and an athlete. We are also confident that this practice has gone on for more than just the past two years. Mrs. Jennings and I could be wrong and the UNC policies do allow staff members, professors, and managers to ask such personal questions of a student's very private activities. If that is the case, I believe every parent considering sending or keeping a student at UNC Chapel Hill should be made aware of what their student could expect.
 
 
 33
 We are also very disappointed that we have brought to your attention several very serious matters ie [sic]: forcing a player to give considerable money, participate in alcohol activities, and now the above. The coach has not recognized these as inappropriate activities and has only responded in a very negative manner including last week. I look forward to your phone call this week now that everyone is back in town.
 
 
 34
 JA 1551-52.
 
 
 35
 The University has had written policies against sexual harassment since the early 1990's, and had informed the students, staff, and faculty of the policies. See JA 199-200, 305-06, 719-25, 789-90, 923-26. Dorrance was aware of the policies. JA 804-05.
 
 
 36
 After Ehringhaus received Craig Jennings' May 12 letter, she forwarded the letter to Athletic Director Richard Baddour. JA 200. Thereafter, Senior Associate Athletic Director Beth Miller began an investigation. JA 264. Miller also arranged a meeting with Jennings, Craig Jennings, Ehringhaus, Baddour, Dorrance, and herself. JA 264-65, 266, 661-62.
 
 
 37
 On May 26, 1998, Jennings and her father, Craig Jennings, met with Baddour, Miller, Ehringhaus, and Dorrance. JA 1400-02, 1479-80. Ehringhaus asked Jennings if she wanted to speak without Dorrance present, but Jennings declined because it did not matter to her that Dorrance was in the room. JA 1405. At the meeting, Jennings recounted (among other things) Dorrance's alleged conduct at practices (including inquiries about other players' personal lives and sexual comments) and his alleged comment to her in the one-on-one meeting in December 1996. JA 1404-06. Dorrance strongly denied ever discussing sexual activity in a one-on-one meeting with any player, but acknowledged that he participated in group discussions at practice of a jesting or teasing nature with women on the soccer team. JA 1404, 1531.
 
 
 38
 By letter dated June 9, 1998, Athletic Director Baddour wrote Craig Jennings a letter which stated:
 
 
 39
 Any unwelcomed discussions, including jesting, regarding sexual activity and team members' relationships with men are inappropriate in the context you described. While Coach Dorrance strongly denies that he has ever discussed an individual team member's sexual activity in a one-on-one discussion, Coach Dorrance has acknowledged that he participated in group discussions of a jesting or teasing nature with soccer team members. This is altogether inappropriate. While his actions were not intended to be offensive, he now realizes that his involvement in such discussions is inappropriate, and he will immediately discontinue that activity. Appropriate interventions have also occurred with Coach Dorrance to address these unacceptable conversations.
 
 
 40
 JA 1531. Dorrance endorsed the apology. Id.
 
 
 41
 By letter dated June 10, 1998, Athletic Director Baddour wrote Dorrance a letter. It stated:
 
 
 42
 As I indicated to you in our last meeting I am writing to officially notify you that it is inappropriate for you to have conversations with members of your team (individually or in any size group) regarding their sexual activity. Please refer to my letter of June 9, 1998 to Craig Jennings.
 
 
 43
 JA 1533; see also JA 1459, 1515-18.
 
 II.
 
 44
 On August 25, 1998, Jennings and Keller sued the defendants. On November 13, 2002, the district court granted in part the defendants' motion to dismiss. Jennings v. Univ. of N.C. at Chapel Hill, 240 F.Supp.2d 492 (M.D.N.C.2002). The parties proceeded with discovery on the remaining claims, which included: (1) a Title IX claim against the University; (2) section 1983 claims for damages against Dorrance for invasion of privacy, against Dorrance and Palladino for sexual harassment, and against University officials Susan Ehringhaus, John Swofford, Richard Baddour, Beth Miller, and the estate of Michael Hooker[7] for failure to supervise Dorrance and Palladino and prevent the alleged violations of Jennings' rights; and (3) a common law invasion of privacy claim against Dorrance.
 
 
 45
 Keller settled her claims with the defendants. On March 24, 2004, Keller and the defendants filed a stipulation of dismissal with prejudice as to Keller's claims. See JA 15.
 
 
 46
 The defendants moved for summary judgment on all remaining claims. Jennings, the sole remaining plaintiff, opposed the motion for summary judgment and moved to strike the defendants' amended answer and for default judgment, alleging that Dorrance's deposition testimony contradicted assertions put forth in the amended answer. Jennings also moved to strike a number of exhibits attached to Dorrance's affidavit, which had been submitted in support of the motion for summary judgment. On October 27, 2004, the district court granted summary judgment to the defendants on all remaining claims and denied plaintiff's motions. Jennings v. Univ. of N.C. at Chapel Hill, 340 F.Supp.2d 666 (M.D.N.C.2004).
 
 
 47
 Jennings filed a timely notice of appeal. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.
 
 III.
 
 48
 We review the district court's grant of summary judgment de novo. Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 283 (4th Cir.2004) (en banc). Summary judgment is appropriate when, after reviewing the record taken as a whole, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party seeking summary judgment has the initial burden to show absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a genuine issue of material fact exists. Mere allegations or denials are insufficient. Anderson, 477 U.S. at 248, 106 S.Ct. 2505. A mere scintilla of evidence supporting the case is also insufficient. Id.; see also Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.1994). We construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. Matsushita Elec. Indus. Co., 475 U.S. at 587-88, 106 S.Ct. 1348.
 
 IV.
 
 49
 Title IX states in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2004). Title IX applies to the University, including its athletic department and women's soccer program. See 20 U.S.C. § 1687.
 
 A.
 
 50
 In Cannon v. University of Chicago, 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court held that Title IX is enforceable through an implied right of action. In Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 63-64, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Court analyzed a Title IX claim involving the alleged sexual harassment of a female high school student by one of her male teachers. The Court reviewed a motion to dismiss and addressed whether such a plaintiff could recover monetary damages from the school district (i.e., the Title IX funding recipient) or was limited to injunctive relief. Id. The Court held that the implied right of action under Title IX supports a claim for monetary damages against the school district. Id. at 76, 112 S.Ct. 1028. The Court in Franklin, however, did not address the standard to be applied in assessing the validity of a sexual harassment claim under Title IX or the standard to be applied for liability to attach to the school district.
 
 
 51
 In Gebser v. Lago Vista Independent School District, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the Court addressed when a school district may be held liable for damages in an implied right of action under Title IX for the sexual harassment of a high school student by one of the district's teachers. The Court held "that damages may not be recovered in those circumstances unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." Id. at 277, 118 S.Ct. 1989. In Gebser, however, the Court did not address what a plaintiff would have to demonstrate to establish an actionable sexual harassment claim under Title IX.
 
 
 52
 In Davis v. Monroe County Board of Education, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), the Court considered a case of alleged student-on-student sexual harassment in the fifth grade of an elementary school. The Court held that a private damages action may lie against a school board in the case of such student-on-student harassment "but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." Id. at 633, 119 S.Ct. 1661. The Court noted that "sexual harassment is a form of discrimination for Title IX purposes...." Id. at 649-50, 119 S.Ct. 1661. The Court held that a "plaintiff [in a student-on-student case] must establish sexual harassment... that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim's educational experience that the victim-students are effectively denied equal access to an institution's resources and opportunities." Id. at 651, 119 S.Ct. 1661 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).
 
 
 53
 "Whether gender-oriented conduct rises to the level of actionable `harassment' thus `depends on a constellation of surrounding circumstances, expectations, and relationships'. . . including, but not limited to, the ages of the harasser and the victim and a number of individuals involved...." Davis, 526 U.S. at 651, 119 S.Ct. 1661 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); citing OCR Title IX Guidelines 12041-42 (1997)). As an example of actionable student-on-student harassment under Title IX, the Court discussed male students physically threatening their female peers "every day, successfully preventing the female students from using a particular school resource — an athletic field or computer lab, for instance." Id. at 650-51, 119 S.Ct. 1661. If school district administrators were "well aware of the daily ritual, yet they deliberately ignored requests for aid from the female students wishing to use the resource ... [then] [t]he district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages." Id. at 651, 119 S.Ct. 1661.
 
 B.
 
 54
 A plaintiff asserting a Title IX hostile environment claim must show: (1) that she belongs to a protected group (e.g., a student at an institution covered by Title IX); (2) that she was subjected to harassment based on her sex; (3) that the harassment was sufficiently severe or pervasive[8] to create an abusive educational environment; and (4) a cognizable basis for imputing institutional liability under Title IX. See Hayut v. State Univ. of N.Y., 352 F.3d 733, 745-53 (2d Cir.2003); Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir.2002).[9]
 
 
 55
 In analyzing whether a person was subjected to actionable sexual harassment under Title IX, courts have looked to precedent under Title VII. See, e.g., Frazier, 276 F.3d at 65-66; see also Smith v. Metro. Sch. Dist. Perry Twp., 128 F.3d 1014, 1023 (7th Cir.1997); Lam v. Curators of the Univ. of Mo., 122 F.3d 654, 656-57 (8th Cir.1997). Courts have done so because the Supreme Court in Franklin and Davis cited its Title VII jurisprudence. See Davis, 526 U.S. at 651, 119 S.Ct. 1661; Franklin, 503 U.S. at 75, 112 S.Ct. 1028.
 
 
 56
 In examining whether a plaintiff was subjected to actionable sexual harassment under Title VII in the form of a hostile work environment, we have stated that "a female plaintiff must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc). As for imputing liability to a Title IX funding recipient, Title IX "conditions `an offer of funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds.'" Baynard v. Malone, 268 F.3d 228, 237 (4th Cir.2001) (quoting Gebser, 524 U.S. at 286, 118 S.Ct. 1989). Title IX requires that a funding recipient must actually be aware of the discrimination and fail to remedy it. Id. "In other words, a [funding recipient] may be held liable under Title IX `only for its own misconduct'; the implied damages remedy is available only when `the funding recipient engages in intentional conduct that violates the clear terms of the statute.'" Id. (quoting Davis, 526 U.S. at 642, 119 S.Ct. 1661). The funding recipient cannot be held liable under principles of respondeat superior or constructive notice. Id. "`[A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [funding recipient's] behalf has actual knowledge of discrimination and is deliberately indifferent to it.'" Id. (quoting Gebser, 524 U.S. at 290, 118 S.Ct. 1989).
 
 C.
 
 57
 Jennings argues that a genuine issue of material fact exists as to whether Dorrance and Palladino created a hostile environment based on her sex under Title IX. Jennings relies on the regular nature of Dorrance's sexual comments at practice during her two years on the team, the severity of the question in the hotel room in December 1996, the age difference between Dorrance and the plaintiff, and the position of power Dorrance held over the plaintiff as her college soccer coach. The defendants respond that the conduct was not sufficiently severe or pervasive, that the conduct was not based on Jennings' sex, and that no basis exists to impute liability to the University.
 
 
 58
 In analyzing an alleged hostile work environment based on sex in the Title VII context, the "conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The work environment must have been "permeated with discriminatory intimidation, ridicule and insult ... that [was] sufficiently severe or pervasive to alter the conditions" of plaintiff's work environment and have created a hostile environment based on sex. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotations omitted). This standard "protects ... working women from the kind of male attentions that can make the workplace hellish for women." Ocheltree, 335 F.3d at 333 (quotation omitted); see Anderson v. G.D.C., Inc., 281 F.3d 452, 456-59 (4th Cir.2002); Smith v. First Union Nat'l Bank, 202 F.3d 234, 238-43 (4th Cir.2000). At the same time, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive ... environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." Harris, 510 U.S. at 21, 114 S.Ct. 367.
 
 
 59
 Under Title VII, a court must look at all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23, 114 S.Ct. 367. No one factor is dispositive. However, simple teasing, sporadic use of abusive language, off-hand comments, gender-related jokes, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Faragher, 524 U.S. at 788, 118 S.Ct. 2275. Title VII is not intended to serve as a workplace civility code, is not designed to purge the workplace of vulgarity, and does not countenance a federal cause of action for unpleasantness. Id.; Anderson, 281 F.3d at 459; Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir.1997). Likewise, the totality-of-the-circumstances analysis recognizes that some behavior would be abusive in one setting, but not abusive in another setting. See Oncale, 523 U.S. at 81, 118 S.Ct. 998 (a football player's environment "is not severely or pervasively abusive ... if the coach smacks him on the buttocks as he heads onto the field — even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office").
 
 
 60
 Under Title VII, the "severe or pervasive" requirement has both subjective and objective components. Harris, 510 U.S. at 21-22, 114 S.Ct. 367. The objective component helps courts to "police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir.1999) (en banc) (quotation omitted); see also Anderson, 281 F.3d at 458-59; Hartsell, 123 F.3d at 773. The Supreme Court in Faragher made clear that the "conduct must be extreme" to be actionable and that lower courts had appropriately applied the objective component and granted summary judgment where "the alleged harassment was not actionably severe or pervasive." 524 U.S. at 788, 118 S.Ct. 2275. On one side lies "the merely vulgar and mildly offensive" and on the other lies "the deeply offensive and sexually harassing." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir.1995) (quotation omitted).
 
 
 61
 Before and after Faragher, in the context of motions for summary judgment or motions for judgment as a matter of law, we have applied the objective component to determine whether a reasonable jury could find the alleged conduct to be actionably severe or pervasive. For example, in Hartsell, we affirmed the entry of summary judgment where male co-workers made comments to a female employee, over a three-month period including: 1) stating that the male workers had made every female employee "cry like a baby" and would do the same to her; 2) stating that more "buxom" women were needed at the office; 3) asking the plaintiff if she would become a "mini van driving mommy"; and 4) stating that the plaintiff should go home to "fetch [her] husband's slippers like a good little wife." Hartsell, 123 F.3d at 773. The court noted that there were no allegations that the plaintiff had been "inappropriately touched, propositioned, flirted with, taunted, or even ogled." Id. The court also noted that "the only vulgarities documented in the record — a reference to masturbation and profane name-calling — were uttered by Hartsell herself." Id.
 
 
 62
 Similarly, in Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745 (4th Cir.1996), we upheld summary judgment for the employer in a Title VII same-sex sexual harassment case because the alleged harassment was insufficiently severe or pervasive to create an objectively hostile work environment. In Hopkins, over a seven-year period, the supervisor at issue approached the plaintiff in the bathroom and said "Ah, alone at last," wrote "kiss, kiss" and drew hearts on office mail directed to the plaintiff, asked the plaintiff if he had gone on dates or had sex with anyone recently, tried to greet the plaintiff at his wedding by kissing him, placed a magnifying lens over the plaintiff's crotch and asked "Where is it?", asked the plaintiff how much he liked the supervisor, tried to squeeze through doors at the same time as the plaintiff in an effort to make physical contact, and regularly commented on the plaintiff's appearance. Id. at 747-48. In affirming summary judgment, we noted that the supervisor's conduct occurred over several years and that most of the conduct and sexual comments took place in group settings and were not directed at plaintiff. Id. at 753. We also noted that the supervisor never "made an overt sexual proposition or touched [the plaintiff] in a sexual manner," and concluded that, while the conduct at issue was "inappropriately forward," no reasonable jury could find that the conduct was actionably severe or pervasive. Id.
 
 
 63
 Of course, we also have ruled on several occasions that questions of severity and pervasiveness should go to the jury. For example, in Smith v. First Union National Bank, 202 F.3d 234 (4th Cir.2000), we reversed the entry of summary judgment for the defendant-employer after concluding that the conduct of the plaintiff's supervisor created a genuine issue of material fact as to whether the conduct was actionably severe or pervasive. Id. at 243. This conduct included "a barrage of threats and gender-based insults" that plaintiff's supervisor directed at her and that occurred more than thirty times in the first few weeks of plaintiff's employment. Id. at 238. The supervisor routinely directed demeaning comments about women at the plaintiff such as stating that the only way a woman could get ahead at the bank was to "spread her legs." Id. at 239. This conduct also included threatening language such as directing the plaintiff that she should carry out his orders "or else," and that he could "see why a man would slit a woman's throat." Id. The latter comment was made after the supervisor spun the plaintiff around in her chair to face him. Id. We stated that "[a] work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances." Id. at 242. We distinguished Hartsell, in part, on the grounds that the behavior in Smith included physical threats. Id. at 243; see also Ocheltree, 335 F.3d at 328-29, 333 (finding that daily vulgar talk and antics of male co-workers in a work environment where the plaintiff was the sole female employee, when coupled with three incidents directed at plaintiff including simulation of sex acts on mannequins directed at plaintiff, vulgar and graphic jingles directed at plaintiff, and vulgar and graphic pornography presented to plaintiff, were sufficient evidence for a reasonable jury to find the conduct actionably severe or pervasive); Anderson, 281 F.3d at 456-59 (overturning judgment as a matter of law after concluding that "barrage" of sexual comments directed at plaintiff on "daily basis" (including a threat to rape her) was "unquestionably sufficient" to create a jury question as to whether the conduct was actionably severe or pervasive); EEOC v. R & R Ventures, 244 F.3d 334, 337-40 (4th Cir.2001) (jury question on whether the harassment was actionably severe or pervasive where male supervisor directed daily sexual jokes and discussions of sexual positions and sexual experiences at 15-year-old female employee, repeatedly asked if she liked to be spanked, and frequently said women were stupid as compared to men; and where the same supervisor constantly flirted with a 20-year-old female employee, complained to her about how long it had been since he had sex, repeatedly made sexual comments to her, and belittled her in front of her co-workers); Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 193-99 (4th Cir. 2000) (jury question on whether the harassment was actionably severe or pervasive where plaintiff, over a two-year period, was frequently given demeaning tasks and fewer opportunities for promotion than male counterparts, routinely asked if she "got any" the previous night or was "on the rag," was regularly mocked, ridiculed, and physically threatened by male co-workers, and was forced to remove the rags covering the bloodstains on her pants after suffering uterine bleeding).
 
 
 64
 Using these Title VII cases as a helpful guide to examine the Title IX environment at issue in this case, we now examine the evidence that Jennings cites to support her argument that the environment to which she was exposed was sufficiently severe or pervasive to raise a jury question. Jennings relies on the following: (1) the sexual banter that Dorrance engaged in at practice with other women on the team and a comment that she once overheard Dorrance make at practice; (2) the "severe" nature of the question Dorrance asked her in December 1996; (3) two incidents at practice where her personal life was mentioned; (4) the age difference between plaintiff and Dorrance; and (5) the position of power that Dorrance had over her arising from his position as the soccer coach.[10]
 
 
 65
 As for the sexual banter that Jennings heard at practice while stretching during her two years on the team, this banter occurred in a group setting as approximately 26 women on the team warmed up for a short period of time before practice and talked about a number of topics, including schoolwork, social lives, who they were dating, and their sex lives. These comments were not directed at Jennings. Tellingly, Jennings does not appear to object to some of her teammates talking about their sex lives. Rather, she objects to Dorrance participating in the conversations. Even if we assume Dorrance's participation in these conversations constitutes harassment, such "`second-hand' harassment, although relevant, [is] less objectionable than harassment directed at the plaintiff." Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903 (7th Cir.2005). For example, in White v. Federal Express Corp., 939 F.2d 157, 161 (4th Cir.1991) (per curiam), we rejected the plaintiff's race-based hostile work environment claim where it rested on a racially offensive exchange not directed at plaintiff. Likewise, in Hopkins we upheld the entry of summary judgment in the plaintiff's sex based hostile work environment suit for several reasons, including that most of the incidents about which the plaintiff complained took place in group settings and were not directed at the plaintiff. Hopkins, 77 F.3d at 754. Similarly, although the conduct in Ocheltree took place in a group setting within a manufacturing facility, the plaintiff in Ocheltree was the sole female employee in the group and we concluded:
 
 
 66
 Here, a reasonable jury could find that, taken together, the various mannequin incidents, the vulgar song and picture, and the graphic descriptions of sexual activity (especially oral sex) that consistently painted women in a sexually subservient and demeaning light were sufficiently severe or pervasive to alter the conditions of Ocheltree's employment and to create an abusive work environment. After a time, Ocheltree was subjected every day to some variety of this offensive conduct, which was humiliating to her personally and to women in general. The harassment became so offensive at times that it drove Ocheltree from the room. It surely made it more difficult for her to do her job. A rational jury could find that a reasonable person in Ocheltree's situation would regard the work environment at Scollon Productions as abusive.
 
 
 67
 Ocheltree, 335 F.3d at 333; see also Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184-86 (4th Cir.2001)(considering both second-hand harassment as part of the general environment (including daily racial epithets) and an "incessant racial invective" targeted at plaintiff "individually").
 
 
 68
 The record also indicates that Jennings' teammates who engaged in these conversations did not find the conversations offensive. See JA 320-31. Further, the comments hardly painted women in a sexually subservient, negative, or demeaning light. Instead, according to Jennings, the comments related to consensual sexual behavior that some team members engaged in with their boyfriends or dates. Even if Dorrance encouraged and participated in these discussions, no evidence indicates that the women participating in the conversations were unwilling participants. In fact, Keller described the process of warming up before practice and the conversations that took place. According to Keller, some women were "wide open" about their personal lives, others were in an intermediate group, and others were reserved. JA 1053-56. Jennings acknowledges that she never participated in the discussions. JA 1242-43, 1585.
 
 
 69
 As for once overhearing Dorrance and a male trainer use the phrase "Asian threesome" at a water break during practice, Jennings admits that neither the conversation nor the reference related to her or was directed at her, and that she only heard Dorrance use that phrase one time. At most, this comment is an offensive utterance.
 
 
 70
 Without ignoring the background conversations mentioned above, we now turn to conduct directed at the plaintiff during her two years on the team. Jennings identifies three incidents. The primary incident involves her one-on-one meeting with Dorrance while the team was in California at the December 1996 Final Four. Dorrance told Jennings that her grades were not acceptable, asked whether her social life was affecting her grades, and then asked, "Who are you f* * *ing?", and whether that was affecting her grades. Jennings responded that her personal life was "none of his g* * d* * * business" and Dorrance did not make any further inquiry about her sex life. A second episode arose in which a teammate asked Jennings about a visit with her boyfriend, and Dorrance, overhearing the conversation, asked either "So, Trim'n[?]" or "yes, what about Trim'n?" Jennings ignored the inquiries from her teammate and Dorrance and went to the practice field. Finally, a teammate once asked Jennings whether a man in the stands was her boyfriend and Dorrance allegedly was present during the conversation but did not say anything.[11]
 
 
 71
 As phrased, Dorrance's question in the hotel room clearly was inappropriate. At the same time, as Jennings' coach, Dorrance certainly had an interest in her academic performance and determining whether her social life was contributing to her poor academic performance. The question was not physically threatening and not a sexual proposition. Rather, it was an offensive utterance from a coach to a player in the context of inquiring about Jennings' poor grades — grades that were so poor that she believed her athletic eligibility was in jeopardy. Moreover, her forceful rejection of Dorrance's inquiry undercuts the notion that his age and power (as her coach) transformed this one question into a "severe" example of sexually harassing behavior, such as a sexual assault or rape.[12] Likewise, the "Trim'n" comment was nothing more than an offhand comment by Dorrance as a follow-up to teasing from a teammate. As for the teammate's inquiry about whether someone was Jennings' boyfriend, Dorrance was simply a bystander and did not participate in that simple teasing.
 
 
 72
 In analyzing this case, we do not ignore Dorrance's role as a college soccer coach or the context in which this conduct occurred. We are not examining the atmosphere in a typical university classroom with a typical university instructor or even the atmosphere in a typical workplace. Instead, we recognize that Dorrance (like many college coaches) was in a different position vis-a-vis the women on the team than a typical university instructor. A typical college coach is going to have much more informal, casual, one-on-one contact with a student-athlete than a typical university instructor will have with a student. College sports often involve long daily practice sessions, overnight travel, down-time before and after games and practices, and the need for a coach to discuss issues associated with academic performance, athletic performance, and health (including such topics as diet, weight, and physical fitness). Additionally, although this case does not involve any issue of improper touching, a college coach is much more likely to demonstrate an athletic move with a hands-on demonstration and more likely to celebrate an individual or team success with a high five or a hug. Likewise, some coaches will use profanity, slang, sarcasm, or hamhanded humor, or will yell at a player or group of players to express displeasure, to make a point, or to motivate. Such lapses in linguistic gentility do not necessarily equal a sexually hostile educational environment. This is true whether the coach is a woman coaching women, a man coaching men, a woman coaching men, or a man coaching women.
 
 
 73
 At the same time, we realize that a college coach does have the ability to control playing time, retention of a scholarship, or whether a person remains on the team. We also realize that most college coaches (as in this case) are going to be older than the men or women that they coach.[13] These factors do place the coach in a more powerful position than the college athlete. The objective totality-of-the-circumstances inquiry, however, allows a court to analyze all of these factors in the context of whether a given coach-player interaction has crossed the line separating "the merely vulgar and mildly offensive" to "the deeply offensive and sexually harassing." Baskerville, 50 F.3d at 431 (quotation omitted); see Oncale, 523 U.S. at 81, 118 S.Ct. 998.
 
 
 74
 In this case, we conclude that no reasonable jury could find that Dorrance's remarks during Jennings' two-year tenure on the team were sufficiently severe or pervasive to create a sexually hostile educational environment. A recent Title IX case dealing specifically with the interaction between a collegiate athlete and her coach supports the conclusion that Dorrance's actions do not create a jury question as to whether the alleged conduct was sufficiently severe or pervasive. In Klemencic v. Ohio State University, 10 F.Supp.2d 911 (S.D.Ohio 1998), aff'd, 263 F.3d 504 (6th Cir.2001), the district court granted summary judgment for Ohio State University against a student athlete's Title IX claim that her college coach created a hostile educational environment. Klemencic, a cross-country runner whose eligibility to compete had expired but who still wished to train with the team, alleged that the school's male cross-country coach created a hostile environment over a two-year period by asking her out on two dates, sending her a sexually suggestive photograph and article cut from a tabloid magazine, offering her rides home from practice, extending the use of his apartment when her lease expired, and asking about her relationship with her boyfriend. Klemencic, 10 F.Supp.2d at 916-17. Assuming these alleged facts as true for purposes of summary judgment, the district court held that these actions did not "appear to have been more than `merely offensive,' if offensive at all," and granted Ohio State's motion for summary judgment. Id. at 917 (citation omitted). On appeal, the Sixth Circuit affirmed. Klemencic, 263 F.3d at 511.
 
 
 75
 Plaintiff cites a number of cases where courts have held that a jury question existed as to the severity or pervasiveness of alleged harassment, but those cases are easily distinguished. In Doe v. Green, 298 F.Supp.2d 1025 (D.Nev.2004), a 14-year-old high school student was seduced into a sexual relationship with her coach. In Hayut v. State University of New York, 352 F.3d 733 (2d Cir.2003), a college professor specifically directed comments at the plaintiff every week in a university class. The student supposedly resembled Monica Lewinsky, and the professor likened plaintiff to Monica Lewinsky in class, referred to her as "Monica" almost every class period during the entire semester, and repeatedly directed crude references at her both in and out of class such as "I will give you a cigar later," and "How was your weekend with Bill?" Id. at 738-39. The professor directed these comments at the student during the Clinton-Lewinsky sex scandal. Id.[14] These cases are not analogous to the conduct at issue in this case.
 
 
 76
 In light of our holding that the alleged conduct was not sufficiently severe or pervasive to create a sexually hostile educational environment, we need not address the University's argument that the conduct was not because of plaintiff's sex. Cf. Ocheltree, 335 F.3d at 331-32 (analyzing "because of sex" inquiry under Title VII); Bowman v. Shawnee State Univ., 220 F.3d 456, 463-64 (6th Cir.2000) (same). Likewise, we need not address whether any cognizable basis exists to impute liability to the University under Gebser and Davis. See Baynard, 268 F.3d at 237 (discussing the Gebser/Davis standard).
 
 D.
 
 77
 We acknowledge, but respectfully disagree with the dissent. In many instances, the dissent relies on evidence that is not relevant to Jennings' claims or evidence that does not support Jennings' claims to the extent that the dissent suggests. We comment on a few.
 
 
 78
 The dissent incorrectly attempts to rely on large portions of Keller's testimony in connection with Jennings' claims. For example, the dissent asserts that Keller testified that Dorrance "would make inappropriate sexual comments to players `anytime the team was together,' whether `on a plane, in a car, or on a bus, in a hotel, at practice, out of town, at events.'" Post at 283 (citing JA 1066). This assertion is incorrect. Keller was asked, "Was there inappropriate conduct other than at team time by Dorrance?" JA 1066. In response, she testified, "It could be, you know, when we're out of town, on a plane, in a car, or on a bus, in a hotel, at practice, out of town, at events, I mean anytime the team was together." JA 1066 (emphasis added). Keller was then asked, "And what was the inappropriate conduct that you believe he engaged in?" JA 1067. Keller replied, "Just getting into individuals' personal lives of who they're dating, who they're sleeping with, whether they're sleeping with someone, whether they're not, how hung over they are, how much they're drinking, any of — all of that." JA 1067. Keller was then asked for specific incidents. JA 1067. She testified about two. JA 1068-71.
 
 
 79
 The first incident involved Dorrance allegedly telling Keller (when they were alone together at a restaurant for lunch) that "he would die to be a fly on the wall the first time that [Keller's] roomate[, a fellow player and born-again Christian,] had sex." JA 1068. The dissent makes much of this comment in connection with Jennings' claims, but fails to mention that Dorrance allegedly made this comment to Keller in the spring of 1994 — more than two years before Jennings enrolled at the University. JA 1068. The dissent also states that "Keller relayed this comment to some players, including Jennings, to indicate how stunned and appalled she was by it." Post at 284. However, the record reflects that although Jennings said that Keller told her about this spring 1994 conversation, Jennings did not testify when the conversation with Keller occurred. JA 1237.
 
 
 80
 The second incident involved Dorrance "joking around" at practice and "making fun" "[of teammate A.F. who] was with more than one person in one night." JA 1071. Keller was then asked, "What's the next thing you remember [Dorrance] doing that was inappropriate? And we're still talking about the team now." Id. Keller responded: "I know. I mean it would just be more — I can't — I mean it happened more than once. The [A.F.] comment was probably the worst, but you know, just comments about people's individual lives at practice would be what followed that. And then the other specific ones after that I don't — I can't think of at the moment." JA 1071.
 
 
 81
 The dissent also cites Keller's testimony for the proposition that Dorrance "asked another player if she was `going to have sex with the entire lacrosse team,' and he advised another player'[Y]ou just have to keep your knees together ... you can't make it so easy for them.'" Post at 284 (citing JA 1127). The dissent, however, fails to note that Keller did not testify that these comments were made during the one year that Keller and Jennings were teammates (i.e., the 1996-97 school year)(see JA 1123-27) and fails to note that Jennings never testified that she heard these comments.
 
 
 82
 As for Keller's specific testimony about Jennings, Keller was asked, "What do you know of any inappropriate conduct that [Dorrance] had with Melissa Jennings?" JA 1071-72. Keller responded that they were only teammates for one year and that "the only one that I was told or was made aware of was an incident when I was captain and he made her go withdraw money from a bank and use it for team — it was after the hurricane, and use it to get the team water. We were out warming up, because I was a senior at that time. And that's the only one I was made aware of." JA 1072. Later in her testimony, Keller clarified that she did not witness this incident. Rather, Jennings told her about the incident, either before or after they filed suit together. JA 1156-57.
 
 
 83
 Although Keller testified that the incident involved water, the incident actually involved Gatorade. As to the Gatorade incident, the dissent states that "Dorrance let Jennings know at the beginning of her freshman year that she was within his sights. He singled her out in front of the entire team, labeling her as `rich' and ordering her to withdraw $400 from her bank account to pay for a team supply of Gatorade." Post at 288 (citing JA 1301-02). Whatever the propriety of Dorrance's conduct in connection with the Gatorade incident, Title IX has nothing to do with alleged harassment based on wealth. Accordingly, we view the Gatorade incident in September 1996 as completely irrelevant.
 
 
 84
 The dissent also claims that "Dorrance showed overt affection for one player, Keller, in front of the entire team." Post at 284. In support of this claim, the dissent cites, inter alia, Steelman's declaration. Id. Steelman's declaration states that "[i]n the beginning, I observed Anson Dorrance's inordinate attention towards Debbie Keller. I observed him touching her, particularly putting his arm around her shoulder, dangling his hand in front of her chest. I observed him touching her hair. I recall Debbie's body language indicating strong discomfort, frequently rolling her eyes and giving a grimaced look. My observation was that the touching made Debbie unhappy and the touching was not consented to." JA 1452-53.
 
 
 85
 Steelman was on the team in 1995 and 1996. JA 1451. Thus, "in the beginning" means 1995 — a time period before Jennings joined the team in August 1996. Further, the dissent fails to mention that Jennings never testified to making the same alleged observation as Steelman. Cf. JA 1290-91. In fact, not even Keller testified that Dorrance "dangl[ed] his hand in front of [Keller's] chest."
 
 
 86
 Finally, as to Keller, the dissent states: "According to Jennings, during one weight-lifting session when the players were lightly clad, Dorrance called Keller over and walked her outside `towards the stadium, putting his arms around her.'" Post at 284 (quoting JA 1432). The record, however, reveals that Jennings described the weight room incident as follows: "[W]e are in the weight room, [Debbie Keller] goes off and talks with [Dorrance] in the bleachers." JA 1290.
 
 
 87
 The dissent also states that "A few players reacted tearfully [to Dorrance's comments at practice] saying, `I can't believe him. Why would he say that?' or `I can't believe he would say that. I never do that.'" Post at 285 (citing JA 1239-41, 1269-71). The citation reference is to Jennings' opinion testimony about her teammates A.F. (JA 1239-41) and S.D. (JA 1269-71). The A.F. reference relates to Dorrance's alleged comments at practice about A.F.'s sex life. The S.D. reference relates to Dorrance's alleged reference at practice to S.D.'s breasts and her being top-heavy. JA 1269-71. In Jennings' opinion, Dorrance's comments upset A.F. (JA 1241-42) and S.D. (JA 1269-71).
 
 
 88
 A.F. and S.D. submitted affidavits denying that Dorrance ever made any comments to them that were "unwelcome or inappropriate within the context they were made and they were neither harsh, severe nor frequent." JA 330; see also JA 321-23. A.F. also stated that "Coach Dorrance never said anything to me which I considered to be personally hurtful." JA 322. She continued: "I never knew of any of my teammates to complain about Dorrance's comments on their personal lives or state that his comments made them feel uncomfortable. I myself felt extremely comfortable around ... Dorrance." JA 323. S.D. stated that "I was never offended by any comments that Dorrance made during these discussions or conversations." JA 331. Jennings' conclusory "opinion" and "[c]onclusory assertions" about the state of mind of A.F. and S.D. are not enough to withstand summary judgment. See Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 848 (4th Cir.1988).
 
 
 89
 The dissent states that "[a]s Jennings explained, many players feared that `if they gave any sort of opposition [to Dorrance's comments] ... [their] playing time [would be] gone, [their] career [would be] gone.'" Post at 285 (quoting JA 1227). The dissent fails to state that, in giving this opinion, Jennings failed to identify any player (other than herself) who apparently has this alleged subjective fear. Cf. JA 1226-28. Moreover, although Keller did reference a similar subjective fear in her testimony, Keller admitted that she could not think of one time during her four years on the team that Dorrance made a decision about who would play based on things other than their ability to contribute to the team's victory and could not think of one woman who Dorrance retaliated against because the woman objected to or complained about his treatment. JA 1183-84.
 
 
 90
 The dissent also acknowledges that the banter at the beginning of some practices (including Dorrance's remarks) related to consensual sexual activities of certain women on the team. Post at 288-289. The dissent claims, however, that simply because Dorrance's remarks did not portray women as sexually subservient does not mean that "Dorrance's remarks were no less degrading because of that." Post at 289. In support, the dissent cites a student note from the Rutgers Law Review that allegedly surveyed "sociological and theoretical research." Id. (citing Ann Marie Pinarski, When Coaches "Cross the Line": Hostile Athletic Environment Sexual Harassment, 52 Rutgers L.Rev. 911, 926-31 (2000)(hereafter "Pinarski, When Coaches Cross the Line")).
 
 
 91
 The "sociological and theoretical research" cited in the student's Rutgers Law Review note consists of a description of the legal scholarship of "[f]eminist legal scholars who argue for a reconceptualization of sexual harassment" due to "the inadequacies of the current paradigm for evaluating sexual harassment claims." Pinarski, When Coaches Cross the Line, 52 Rutgers L.Rev. at 924. The student note then interprets the allegations against Dorrance "based on the integrated feminist framework" described in the note. See id. at 931; see also id. at 938-43.
 
 
 92
 We assume that the dissent is not relying on this "sociological and theoretical research" for evidentiary purposes. After all, the research was not cited by the parties in this court or the district court, the district court had no opportunity to perform its "gatekeeping" function in connection with the "research" under Fed. R.Evid. 702, and an appellate court reviewing a grant of a motion for summary judgment may examine only the evidence that was before the district court at the time the ruling was made. See, e.g., Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 242 (4th Cir.2002); Katir v. Columbia Univ., 15 F.3d 23, 25 (2d Cir.1994) (per curiam); Welch v. Celotex Corp., 951 F.2d 1235, 1237 n. 3 (11th Cir.1992). Rather, we assume that the dissent is citing the "research" in the student note to support the notion that Dorrance's alleged comments about consensual sexual behavior "humiliated some of the women because it portrayed them as being sexually promiscuous." Post at 289.
 
 
 93
 Notably, the dissent fails to cite testimony from any woman on the team who felt such humiliation due to her alleged portrayal as promiscuous. Further, even though Jennings conducted extensive discovery in this case, the record is devoid of such evidence. Indeed, the record evidence is to the contrary. See JA 321-23. Thus, notwithstanding the "sociological and theoretical research" cited in the dissent and the student note, it is accurate to state that Dorrance's comments and the comments of Jennings' teammates who engaged in these conversations hardly painted women in a sexually subservient, negative, or demeaning light.
 
 
 94
 The dissent's ultimate conclusion is that we "fail[ ] to confront the gravity of the facts advanced by the Jennings." Post at 288. We respectfully disagree. In accordance with Fourth Circuit precedent, we acknowledge that even if Dorrance's participation in conversations at practice with other players constitutes harassment, such second-hand harassment is less objectionable than harassment directed at the plaintiff. Further, it is the dissent that "fails to confront" (1) the undisputed fact that Jennings' evidence (beyond the alleged second-hand harassment) consists of two verbal comments directed at her over two years and (2) the legal consequences that flow from this lack of evidence. See supra at 270-272 (analyzing Fourth Circuit precedent); see also Mendoza, 195 F.3d at 1244-52 (surveying Title VII sexual harassment cases from other circuits).
 
 V.
 
 95
 Jennings seeks to hold Dorrance and Palladino liable for sexual harassment under 42 U.S.C. § 1983. Sexual harassment violates the Fourteenth Amendment and is actionable under section 1983. See Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir.1994). The Title VII hostile work environment analytic framework applies to section 1983 sexual harassment claims. Id. at 529.
 
 
 96
 As mentioned, "[t]o establish a Title VII claim for sexual harassment in the workplace, a female plaintiff must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree, 335 F.3d at 331. Because Jennings has failed to raise a genuine issue of material fact as to the third element as to either Dorrance or Palladino, plaintiff's section 1983 claim fails.
 
 VI.
 
 97
 Jennings contends that the district court erred in granting summary judgment on her claim brought under 42 U.S.C. § 1983 that Dorrance violated a "constitutional zone of privacy" by asking her about her sex life. (Appellant's Opening Br. 34) (citing Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).) In Whalen, the Court stated that its "cases sometime characterized as protecting `privacy' have ... involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Whalen, 429 U.S. at 599-600, 97 S.Ct. 869 (footnotes omitted). Although Jennings argued below that Dorrance violated both interests, on appeal Jennings proceeds only under the disclosure prong. (Appellant's Opening Br. 34-36); cf. Jennings, 340 F.Supp.2d at 676 (rejecting claims under either the independent decision-making or informational privacy lines of cases).
 
 
 98
 Even if we accept plaintiff's contention that the Supreme Court's "privacy" cases sometimes protect "avoiding disclosure of personal matters," Whalen, 429 U.S. at 600, 97 S.Ct. 869, plaintiff appears to concede that a forced disclosure is necessary under this theory. (See Appellant's Opening Br. 35.) Indeed, she principally relies on Thorne v. City of El Segundo, 726 F.2d 459 (9th Cir.1983), a case that involved a police officer who was forced to disclose "information regarding personal sexual matters" and then not hired based in part on her prior sexual activities. Id. at 468; accord Bloch v. Ribar, 156 F.3d 673, 683-85 (6th Cir.1998) (being forced to reveal information regarding sexual conduct may implicate the interest discussed in Whalen in avoiding disclosure of personal matters); Eastwood v. Dep't of Corr., 846 F.2d 627, 631 (10th Cir.1988) (same); Taylor v. Best, 746 F.2d 220, 225 (4th Cir.1984) (compelling prisoners to answer questions from prison psychologists may implicate their right under Whalen to avoid disclosing personal matters).
 
 
 99
 Jennings' claim fails because she was not forced to disclose anything about her personal sexual conduct. In fact, she rebuffed Dorrance's December 1996 question and that ended the matter. Jennings, however, attempts to avoid the requirement of forced disclosure by arguing that she refused to answer Dorrance's question about her sex life and he then cut her from the team in retaliation for refusing to tell him about her sex life. (Appellant's Opening Br. 36 ("Jennings [sic] refusal to submit to Dorrance's questioning led to her dismissal from the team."); Appellant's Reply Br. 21 ("Jennings' refusal to submit to this inquiry resulted in her removal from the team.").)
 
 
 100
 Despite Jennings' attempt to substitute "forced disclosure" with "retaliation for refusing to disclose," she cannot escape two fatal facts. No evidence of retaliation exists, and too much time elapsed between the December 1996 meeting where Dorrance asked the question and the May 1998 meeting where Dorrance cut Jennings from the team for any rational jury to find that Dorrance cut Jennings from the team because she refused to answer his question. See Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998) (holding that "thirteen month interval between the charge and termination is too long to establish causation [under Title VII] absent other evidence of retaliation"). As such, the district court properly entered summary judgment on this claim.
 
 VII.
 
 101
 Jennings also brought a section 1983 claim against University administrators Swofford, Baddour, Ehringhaus, Miller, and the Hooker estate for failing to adequately supervise Dorrance and Palladino and therefore facilitating the violation of her statutory and constitutional rights. "Supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.1994). To establish such a claim under section 1983, the plaintiff must show:
 
 
 102
 (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices [ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.
 
 
 103
 Baynard, 268 F.3d at 235 (quoting Shaw, 13 F.3d at 799).
 
 
 104
 If no "injury" has taken place, then the plaintiff cannot satisfy element three and the claim fails. Because neither Dorrance nor Palladino violated section 1983, the supervisory defendants cannot be held liable for failing to stop a non-violation. See Klemencic, 263 F.3d at 511.
 
 VIII.
 
 105
 Jennings sued Dorrance for invasion of privacy under North Carolina law. She relies on the December 1996 question in the hotel room and the "Trim'n" reference at practice. The district court granted summary judgment to Dorrance on plaintiff's North Carolina invasion of privacy claim. See Jennings, 340 F.Supp.2d at 678.
 
 
 106
 Although the Supreme Court of North Carolina has not yet examined the contours of this specific privacy tort, the North Carolina Court of Appeals has recognized the tort of invasion of privacy by "intrusion into the seclusion, solitude, or private affairs of another." Miller v. Brooks, 123 N.C.App. 20, 472 S.E.2d 350, 353 (1996) (reversing summary judgment for defendant on claim when separated wife had private detective secretly install a video camera in plaintiff-husband's bedroom and routinely sorted through and discarded some of plaintiff-husband's mail without his permission or knowledge); see Toomer v. Garrett, 155 N.C.App. 462, 574 S.E.2d 76, 90 (2002) (reversing dismissal of invasion of privacy tort claim when defendant viewed and released information from plaintiff's state personnel file without permission). The North Carolina Court of Appeals defined the tort as follows:
 
 
 107
 [O]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.
 
 
 108
 Miller, 472 S.E.2d at 354 (quotations and citation omitted).
 
 
 109
 "Generally, there must be a physical or sensory intrusion or an unauthorized prying into confidential personal records to support a claim for invasion of privacy by intrusion." Broughton v. McClatchy Newspapers, Inc., 161 N.C.App. 20, 588 S.E.2d 20, 27 (2003) (upholding summary judgment for defendant when all of the information at issue was public information). In addition, the conduct at issue "must be so egregious as to be `highly offensive to a reasonable person.'" Id. at 28, 588 S.E.2d 20 (quoting Smith v. Jack Eckerd Corp., 101 N.C.App. 566, 400 S.E.2d 99, 100 (1991)). It is not enough that the conduct offended the plaintiff. Smith, 400 S.E.2d at 100 (affirming summary judgment for defendant store where store alarm sounded as plaintiff left the store, the store employee then searched plaintiff and her children with a scanner and searched under plaintiff's children's coats).
 
 
 110
 In this case, Jennings testified that she refused to answer Dorrance's question in the hotel room about her sex life and that Dorrance then moved to a different topic. Likewise, Jennings ignored Dorrance's "Trim'n" comment at practice. No private information was disclosed in either incident. Cf. Toomer, 574 S.E.2d at 90; Miller, 472 S.E.2d at 353. Further, Dorrance's question in the hotel and his comment at practice do not rise to the level of egregious conduct required under North Carolina law. See Smith, 400 S.E.2d at 100. Accordingly, the district court properly granted summary judgment to Dorrance on this claim.
 
 IX.
 
 111
 Jennings moved to strike the defendants' amended answer and for an entry of default judgment because Dorrance allegedly made statements during his deposition that contradicted the defendants' amended answer. Specifically, in the amended answer Dorrance denied making "lewd and degrading comments regarding other team members in the presence of plaintiffs" (First Amended Complaint ¶ 19), but in his deposition, he testified that he could not recall "whether [he] discussed sexual activity among the team players." JA 848. The district court denied the motion to strike, finding that the two responses were "not clearly factually inconsistent" and that there was no evidence of bad faith. Jennings, 340 F.Supp.2d at 672.
 
 
 112
 Jennings also moved to strike exhibits C through H that were attached to Dorrance's affidavit. Jennings contends that these exhibits were not properly authenticated and constitute inadmissible hearsay. The district court concluded that these exhibits were properly authenticated and qualified as records of regularly conducted activity under Federal Rule of Evidence 803(6) and were therefore admissible. See Jennings, 340 F.Supp.2d at 672-73.
 
 
 113
 Jennings appeals the denial of both of these motions. We review each decision under an abuse of discretion standard. See Supermkt. of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 126 (4th Cir.1995); United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993); Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp., 843 F.2d 808, 809 (4th Cir.1988) (per curiam). Further, the district court's determination that there was no evidence of bad faith and its factual findings underlying its evidentiary rulings are reviewed under a "clear error" standard. See Evans v. Techs. Apps. & Serv. Co., 80 F.3d 954, 962 (4th Cir.1996); Hyatt v. Shalala, 6 F.3d 250, 255 (4th Cir.1993).
 
 
 114
 We have reviewed the record and the district court's reasoning. See Jennings, 340 F.Supp.2d at 671-73. The district court did not abuse its discretion in refusing to strike the amended answer and enter a default judgment and did not commit clear error in declining to find bad faith. Likewise, even assuming the district court abused its discretion in refusing to strike exhibits C through H to the Dorrance affidavit, those exhibits had no bearing on whether Jennings had demonstrated the existence of a genuine issue of material fact on any of her claims.
 
 X.
 
 115
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 116
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 There is also evidence that Dorrance once questioned a player about the size of her boyfriend's genitalia (JA 1452), but there is no evidence Jennings overheard this question
 
 
 [2]
 Dorrance describes his conduct very differently. He states in his affidavit: "I never initiated comments on those topics [of players' boyfriends and private lives], only infrequently heard players' comments on those subjects and even less frequently said anything to any player at those times about those subjects." JA 186;see also JA 777 (letter to Debbie Keller from Anson Dorrance dated March 19, 2004). Palladino likewise testified that he "never initiated discussions on those topics, only infrequently heard players' comments on those subjects and even less frequently said anything to any player at those times about those subjects." JA 336.
 Several former soccer players who were on the team with Jennings submitted affidavits consistent with Dorrance's and Palladino's descriptions. (We refer to these players by their initials.) JA 320 (A.F.Affidavit); JA 324 (N.F.Affidavit); JA 330 (S.D.Affidavit); JA 332 (T.N.D. Affidavit). Because we review the evidence in the light most favorable to Jennings, we accept the truth of Jennings' testimony, Keller's testimony, and Steelman's testimony.
 
 
 [3]
 "Trim'n" was Jennings' nickname on the team. It was derived from her custom license plate and Jennings testified that it had no sexual connotation. JA 1246-47
 
 
 [4]
 At the end of Jennings' first semester, her GPA was 1.538 on a 4.0 scale. JA 1449
 
 
 [5]
 Dorrance denies meeting with Jennings during the 1996 Final Four (JA 185) and also denies asking Jennings (or any other player) this question. JA 186, 1529. Of course, in reviewing an order granting summary judgment, we review the evidence in the light most favorable to Jennings and therefore accept the truth of her testimony on this point
 
 
 [6]
 Jennings' cumulative GPA at the end of her freshman year was 1.539, at the end of the 1997 summer session was 1.903, and at the end of the fall 1997 semester was 1.964. JA 1449-50
 
 
 [7]
 Michael Hooker died on June 29, 1999
 
 
 [8]
 It is unclear whether the heightened standard of "severe, pervasive, and objectively offensive" announced in the student-on-student harassment context inDavis also applies to teacher-on-student harassment cases. See Davis, 526 U.S. at 649-51, 119 S.Ct. 1661. Compare Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir.2003) (applying "severe or pervasive" standard in teacher-on-student harassment case) with Johnson v. Galen Health Insts., Inc., 267 F.Supp.2d 679, 685 (W.D.Ky.2003) (ultimately applying "severe, pervasive, and objectively offensive" standard in teacher-on-student harassment case). At summary judgment in this case, the district court applied the heightened standard stated in Davis. Jennings, 340 F.Supp.2d at 674. The parties did not brief this issue and were at times internally inconsistent as to what standard should apply. (Compare Appellees' Br. 19 (stating that "severe or pervasive" standard governs) with Appellees' Br. 32 (stating that "severe, pervasive, and objectively offensive" standard governs); compare Appellant's Opening Br. 21 (referencing "severe, pervasive, and objectively offensive" standard) with Appellant's Opening Br. 16, 19 (referencing "severe or pervasive" standard).) Because we conclude that plaintiff's claims fail under the lower "severe or pervasive" standard, we need not determine whether the more rigorous standard articulated in Davis applies in this case.
 
 
 [9]
 Title IX was enacted pursuant to Congress' spending power and prohibits discriminatory acts by funding recipients. Because school officials are not funding recipients under Title IX, school officials may not be sued in their individual capacities under Title IXHartley v. Parnell, 193 F.3d 1263, 1270 (11th Cir.1999) (holding that individual school officials may not be held liable under Title IX); Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 611 (8th Cir. 1999) (collecting cases); Smith v. Metro. Sch. Dist. Perry Twp., 128 F.3d 1014, 1021 (7th Cir.1997) (holding that because "neither a principal nor an assistant principal can be considered a grant recipient," plaintiff's Title IX claim against those persons must fail); see also Nat'l Collegiate Athletic Ass'n v. Smith, 525 U.S. 459, 468-69, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999) (receipt of dues from member colleges and universities does not subject NCAA to suit under Title IX).
 
 
 [10]
 Although Jennings presses her claims against Palladino on appeal, the record establishes no grounds on which his actions could be held to have subjected her to a hostile environment based on her sex. Even the dissent concludes that Jennings' claims against Palladino fail as a matter of law. Post at 295 n. 3
 
 
 [11]
 Not even the dissent relies on this third incident. Rather, the dissent focuses on two comments directed at Jennings during her two years on the team. Post at 285
 
 
 [12]
 The dissent states that "[a] rational jury could find that Dorrance's question [in the hotel room in December 1996] constituted sexual harassment, particularly in light of his pattern of asking many of his players the same sort of question." Post at 292. We do not believe that this one question in the hotel room transforms this case into one of those exceptional cases where a single incident of sexual harassment, such as sexual assault or rape, has been deemed sufficient to raise a jury questionSee supra at 270-272 (analyzing Fourth Circuit precedent); see also Mendoza, 195 F.3d at 1244-52 (surveying Title VII sexual harassment cases from other circuits). Indeed, the Supreme Court has stated that "[t]he `mere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." Harris, 510 U.S. at 21, 114 S.Ct. 367 (quoting Meritor Savings Bank, FSB, 477 U.S. at 67, 106 S.Ct. 2399).
 
 
 [13]
 Jennings was age 17 when she entered the University in August 1996 and age 19 when she was cut from the team in May 1998See JA 1449. Dorrance was age 45 to 47 during the relevant time period. See JA 804.
 
 
 [14]
 The dissent asserts that "[e]vidence that other players shared Jennings' humiliation and discomfort indicates that she was objectively reasonable in finding Dorrance's comments offensive and humiliating." Post at 289-290 (citingHayut, 352 F.3d at 747). The dissent then claims that Hayut characterized "reactions of plaintiff's peers [] as `significant to the mandated objective analysis' of whether conduct was sufficiently severe to be actionable under Title IX." Id. at 290.
 The dissent misreads Hayut. In Hayut, the court was discussing other students' reactions to the conduct that the professor directed at the plaintiff, not conduct that the professor directed at other students. Hayut, 352 F.3d at 747. Notably, the only evidence that Keller and Steelman testified that Dorrance directed at Jennings was the Gatorade incident in September 1996. See JA 1072, 1156-57, 1453. As explained infra, at 30-31, the Gatorade incident is completely irrelevant to Jennings' claims.
 MICHAEL, Circuit Judge, dissenting:
 Melissa Jennings's account must be taken as true: when she was seventeen and a member of the women's soccer team at the University of North Carolina at Chapel Hill (UNC or University), her forty-five-year-old male coach, Anson Dorrance, persistently and openly discussed and pried into the sex lives of his players, using what he learned to degrade and humiliate them. The University, according to Jennings's evidence, knew about Dorrance's conduct and failed to take prompt action to stop it. These facts, as amplified in the summary judgment record, entitle Jennings to a trial on her Title IX hostile environment claim against UNC and her § 1983 claim against Dorrance and Susan Ehringhaus, an official at UNC. See Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688; 42 U.S.C. § 1983. The majority affirms the district court's grant of summary judgment to the defendants on the ground that Dorrance's conduct was not sufficiently severe or pervasive to create an environment hostile to women. But a thorough examination of the facts, viewed in the light most favorable to Jennings, reveals that the majority has failed to appreciate the force of her case. Because Jennings has proffered facts showing that the soccer team environment was persistently degrading and humiliating to her and to other young women, she is entitled to a trial. I therefore respectfully dissent.
 I.
 A.
 Jennings was a goalkeeper for the UNC women's soccer team from the beginning of her freshman year, August 1996, until she was cut from the team at the end of her sophomore year, May 1998. As a recruited walk-on, she had been personally recruited by head coach Dorrance but had not been recommended for a scholarship. By all accounts, UNC has long had the best women's soccer program in the country. Dorrance is the most successful women's soccer coach in college history, having won eighteen of the twenty-three national championship games held through 2003. He has also coached the U.S. Women's National Team. According to Jennings, many girls would "cut off their right arm to be at [UNC]" and play for Dorrance. J.A. 1227.
 Jennings reports that Dorrance made sexual comments and inquiries "on a regular basis" while she was a member of the team, from the fall of 1996 through the spring of 1998. J.A. 1585. According to Debbie Keller, Jennings's teammate, Dorrance would make inappropriate sexual comments to players "anytime the team was together," whether "on a plane, in a car, or on a bus, in a hotel, at practice, out of town, at events." J.A. 1066. Amy Steelman, another teammate, said that a "typical Monday afternoon" included Dorrance "prying into our sex lives" and sexual "exploits." J.A. 1452.
 While Jennings was a team member, most of Dorrance's sexual talk occurred during "team time," when the players stretched and warmed up before practice. Dorrance joined "team time" once or twice a week and frequently participated in and encouraged the players' discussions about their sexual activities. Often using the word "fuck," he asked lewd questions and made crude comments. Nearly every day or every other day, he inquired of one player in front of the entire team, "Who [her] fuck of the minute is, fuck of the hour is, fuck of the week [is]," whether there was a "guy [she] ha[dn't] fucked yet," and whether she "got the guys' names as they came to the door or whether she just took a number." J.A. 1236-38, 1261-62. He asked another player if she was "going to have sex with the entire lacrosse team," and he advised another, "[Y]ou just have to keep your knees together... you can't make it so easy for them." J.A. 1127. Of another player, Dorrance inquired whether she was going to have a "shag fest" when her boyfriend visited and whether she "was going to fuck him and leave him." J.A. 1238, 1248. To still another, he asked about the size of her boyfriend's genitalia.
 Dorrance told one player, Keller, that he would "die to be a fly on the wall" the first time that her roommate, a fellow player and born-again Christian, had sex. J.A. 1068. (Keller relayed this comment to some players, including Jennings, to indicate how stunned and appalled she was by it.) Once during a water break at practice, within earshot of Jennings, Dorrance told a trainer that he fantasized about having "an Asian threesome" with his Asian players. J.A. 1229, 1271, 1284-85.
 During practice Dorrance regularly commented on players' "nice legs" and "nice racks" and about their "breasts bouncing." J.A. 393, 1229, 1233, 1236. He described how their "asses [looked] in spandex" and how unbalanced or "top heavy" some players were. J.A. 1073, 1229, 1236. He regularly remarked on one player's "dimples and ... cuteness," J.A. 1271, called one player "fat ass," J.A. 1276, and called another "Chuck" because he suspected that she was a lesbian (her name was Charlotte), J.A. 1228, 1281-82.
 Dorrance showed overt affection for one player, Keller, in front of the entire team. He frequently brushed her forehead, hugged her, rubbed her back, whispered in her ear, and touched her stomach. According to Jennings, during one weight-lifting session when the players were lightly clad, Dorrance called Keller over and walked her outside "towards the stadium, putting his arms around her." J.A. 1432. Steelman likewise observed Dorrance paying "inordinate attention" to Keller, "putting his arm around her shoulder," "dangling his hand in front of her chest," and touching her hair. J.A. 1452. Keller was plainly troubled by Dorrance's affection. Steelman observed Keller's "body language indicating strong discomfort ... giving a grimaced look." J.A. 1452-53. Keller herself confirmed that Dorrance's constant touching "made [her] skin crawl" and made her "fe[el] dirty." J.A. 1145. She did not protest, however, because she feared that Dorrance would retaliate by reducing or even eliminating her playing time.[1]
 With his persistent comments and conduct, Dorrance created a "sexually charged environment" that made Jennings feel "uncomfortable, filthy and humiliated." J.A. 1242, 1250, 1452. Dorrance's comments "all tie[d] together" from girl to girl to girl, putting Jennings in constant fear that she would be his next target. J.A. 1250. As much as she tried to stay out of Dorrance's "radar," J.A. 1242, Jennings could not escape the anxiety and discomfort that she felt and observed in others. She witnessed other players become angry, disgusted, and humiliated by Dorrance's sexual questions and remarks during warm-up or at team gatherings. A few players reacted tearfully, saying, "I can't believe him. Why would he say that?", or "I can't believe he would say that. I never do that." J.A. 1239-41, 1269-71. One player often left practice in tears. Nonetheless, many players feared complaining directly to Dorrance because, as their coach, he controlled positions, playing time, and scholarship eligibility. As Jennings explained, many players feared that "if they gave any sort of opposition ... [their] playing time [would be] gone, [their] career [would be] gone." J.A. 1227. By this, she meant not just any soccer career, but a career with the nation's top collegiate team.
 Jennings "dodged [Dorrance's] bullet a couple times." J.A. 1251-52. But not every time. Dorrance twice targeted Jennings with sexual questions and innuendos. At a tournament in California in fall 1996, at the end of Jennings's freshman season, Dorrance held one-on-one meetings with players in his hotel room to assess their season performance (conditioning, skills, contribution to team chemistry, and academic status). Dorrance told Jennings that she was in danger of losing her eligibility to play soccer if her grades did not improve. In the midst of this discussion, Dorrance asked Jennings, "Who are you fucking?" J.A. 1326, 1330. Jennings replied that it was `[n]one of his God damn business' what she did off field. J.A. 1325. As Jennings described the scene, `I was 17 when he asked me[`Who are you fucking?"] in a dark hotel room, knee-to-knee, bed not made, sitting at one of those tiny tables." J.A. 1230. She felt acutely uncomfortable.
 Dorrance's second sexual comment to Jennings came during a warm-up session in her sophomore year (1997-98). Certain players and Dorrance were inquiring about and discussing one player's recent weekend (called a "shag fest" by Dorrance, J.A. 1248), which ended with a young man crawling out of her window. Jennings had spent that same weekend visiting her boyfriend off campus. Inevitably, as the crude discussion progressed, one player piped up (using Jennings's nickname), "Well, what about Trim'n?" J.A. 1246. Dorrance immediately "chimed in," saying "Yes, what about Trim'n?" J.A. 1248, 1252. Dorrance thereby encouraged the interrogation about personal sexual activity to "slide over" to Jennings. J.A. 1249. She felt humiliated and did not respond.
 B.
 In the fall of 1996, during her freshman year, Jennings notified the University about the sexually hostile environment that Dorrance had created inside the women's soccer program. Sometime between September and November of that year, Jennings met with Susan Ehringhaus, the University's General Counsel and Assistant to the Chancellor, to discuss her complaints about Dorrance. Jennings chose to meet with Ehringhaus because Ehringhaus was a woman and "had presented herself as being okay and [having] open doors to talk." J.A. 1338. Jennings "gave [Ehringhaus] a [complete] run-down" of Dorrance's sexual comments at practice. J.A. 1343. She reported that his conduct rendered the women's soccer environment "humiliating [and] uncomfortable" for her. J.A. 1342. Ehringhaus dismissed these concerns, suggesting that Jennings simply "work it out" with Dorrance. J.A. 1341, 1343. As Jennings puts it, "[Ehringhaus] basically just gave me the sugar coating, [saying] `[Dorrance] is a great guy. I've known him for a long time,' [and with that, she] shoved me out the door." J.A. 1342.
 Dorrance cut Jennings from the team during exams at the end of her sophomore year (May 1998), citing her inadequate fitness. Over the next several days, Jennings's parents telephoned and wrote the Chancellor's office to complain about Dorrance's questions and comments about players' sexual activities. In due course, Richard Baddour, the Director of Athletics, conducted an administrative review pursuant to UNC's sexual harassment policy. Ehringhaus, Baddour, and another University official met with Jennings, her father, and Dorrance around May 26, 1998, when the Jenningses reiterated their complaints about Dorrance's participation in and encouragement of the players' conversations about sex. Dorrance admitted participating in group discussions about players' sexual activities, but claimed that his comments were only "of a jesting or teasing nature." J.A. 1404, 1531. He later admitted in deposition that it would be "entirely inappropriate" for him as a male coach to discuss with any woman player her sexual activity unless she herself raised the topic to seek his advice and "she was doing something that was hurting her." J.A. 838-39.
 The administrative review ended with athletic director Baddour sending a letter of apology to Mr. Jennings and a brief, mild letter of reprimand to Dorrance. On June 9, 1998, Baddour wrote to Mr. Jennings apologizing for Dorrance's "inappropriate... involvement in [sexual] discussions" with his team members. J.A. 1531. Baddour assured Mr. Jennings that "[a]ppropriate interventions ha[d] occurred with Coach Dorrance to address these unacceptable conversations." Id. Dorrance indicated his own apology by counter-signing the letter. One day later, Baddour wrote to Dorrance declaring it "inappropriate for [Dorrance] to have conversations with members of [the] team (individually or in any size group) regarding their sexual activity." J.A. 1533.
 C.
 In August 1998, at the start of Jennings's third year at UNC, Jennings and Keller brought a single action against the University and several individual defendants, including Dorrance and Ehringhaus, asserting (among others) claims under Title IX and § 1983. After the lawsuit was filed, Jennings was threatened and harassed on the UNC campus. One former teammate cursed at and physically threatened her with a lacrosse stick, an incident that she reported to the UNC Public Safety Office. Every night she received harassing and threatening phone calls until the "wee hours" from anonymous university numbers. J.A. 1267. University officials warned Jennings that they could not guarantee her safety on campus and encouraged her to take comparable classes at another university, promising that her credits could be transferred to UNC. Jennings completed her third year at UNC but transferred to Northern Illinois University for her final year. Keller settled her claims and took a dismissal with prejudice. Jennings's case proceeded to the entry of summary judgment in favor of the defendants. That judgment should be vacated to allow Jennings's Title IX and § 1983 claims to proceed.
 II.
 I will first explain why Jennings is entitled to a jury trial on her Title IX claim against UNC. Title IX prohibits sex-based discrimination by educational institutions that receive federal funds. The statute provides that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX, which is patterned on Title VII of the Civil Rights Act of 1964, prohibits sexual harassment that creates a hostile educational environment. Hayut v. State Univ. of New York, 352 F.3d 733, 750 (2d Cir.2003). To establish such a claim, the plaintiff must prove that (1) she was a student at an educational institution receiving federal funds, (2) who was subjected to harassment (3) based on her sex; (4) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) educational environment; and (5) there is a basis for imputing liability to the institution. Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir.2002).
 A.
 The majority concentrates on the hostile environment element and erroneously concludes that Jennings has not proffered adequate facts to raise a triable issue as to whether Dorrance's discussions (in team settings) about the sexual activities of the young women on his soccer team were sufficiently severe or pervasive to create a hostile environment. I recognize, of course, that the "severe or pervasive" element has an objective component: the environment must be regarded as hostile to a reasonable person in the victim's position. See Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir.2003) (en banc). In addition, Title IX, like Title VII, is not a general civility code. See ante at 269. Nevertheless, Title IX protects a student from an educational environment that is permeated with sex-based degradation, insult, ridicule, and intimidation. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Ocheltree, 335 F.3d at 333.
 The majority dutifully catalogs a number of Title VII and Title IX cases analyzing whether conduct is sufficiently severe or pervasive to create an objectively hostile environment. See ante at 267-273. The conduct analyzed in these cases runs the gamut from merely unpleasant comments to physical touching and threats of rape. Compare Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 768-73 (4th Cir.1997) (affirming summary judgment in employer's favor on ground that employer's statements to plaintiff, including that "[w]e've made every female in this office cry like a baby" and that she should "go home an fetch [her] husband's slippers like a good little wife," constituted "mere unpleasantness" not actionable under Title VII), with Anderson v. G.D.C., Inc., 281 F.3d 452, 456-59 (4th Cir.2002) (reversing summary judgment on ground that plaintiff's allegations that supervisor "barraged" her with daily comments about her breasts and buttocks, threatened to rape her, and pressed his penis against her buttocks were "unquestionably sufficient" to submit to a jury). These cases simply confirm that hostile environment analysis "is not, and cannot be [amenable to] a mathematically precise test." Harris, 510 U.S. at 22, 114 S.Ct. 367. Rather, what differentiates mere unpleasantness from actionable (severe or pervasive) harassment depends largely on factual context, that is, the "constellation of surrounding circumstances, expectations, and relationships ... including, but not limited to, the ages of the harasser and the victim." Davis v. Monroe County Bd. of Ed., 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). The "severe or pervasive" inquiry thus examines the "totality of the circumstances," including the frequency and severity of the conduct, its impact in terms of humiliation or threat, and its degree of interference with the victim's educational pursuits. See Harris, 510 U.S. at 23, 114 S.Ct. 367.
 B.
 The facts proffered by Jennings, when viewed in the light most favorable to her, raise a genuine issue of material fact as to whether Dorrance's conduct was sufficiently severe or pervasive to create a sexually hostile environment. The majority, in concluding otherwise, fails to heed the basic rule for reviewing a summary judgment: "The evidence of the non-movant [here, Jennings] is to be believed, and all justifiable inferences are to be drawn in [her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, the majority attempts to brush aside what happened as mere unpleasantness and vulgarity. Jennings, according to the majority, was simply a bystander to her fellow teammates' sexual and social banter, and Dorrance's participation — even if it constituted harassment — was only "second-hand harassment ... [that is] less objectionable." Ante at 272. But see Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999) ("[O]ffensive comments need not be directed at a plaintiff in order to constitute conduct violating Title VII."). The majority fails to confront the gravity of the facts advanced by Jennings. She was not a mere bystander who was unaffected by Dorrance's comments. Rather, she was caught in a hostile environment that was demeaning to young women. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir.2001) (noting that it is important to consider evidence of general atmosphere when evaluating hostile environment claim); Walker v. Ford Motor Co., 684 F.2d 1355, 1359 n. 2 (11th Cir. 1982) ("The fact that many of the epithets were not directed at [plaintiff] is not determinative. The offensive language often was used in [his] presence" and created an environment "heavily charged" with discrimination.) (internal quotation marks and citation omitted). Dorrance's sex-based verbal abuse permeated the atmosphere and at times homed in on Jennings. See Harris, 510 U.S. at 21-22, 114 S.Ct. 367 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).
 Dorrance let Jennings know at the beginning of her freshman year that she was within his sights. He singled her out in front of the entire team, labeling her as "rich" and ordering her to withdraw $400 from her bank account to pay for a team supply of Gatorade. J.A. 1301-02. She was in perpetual fear that Dorrance would inevitably direct his "filthy comments" at her, as he shifted his focus from one girl to the next to the next. J.A. 1242-43, 1250. His comments and questions "all tie[d] together," J.A. 1250, as he pried into players' sexual activities and exploits and made graphic remarks about their "racks" and "asses in spandex," J.A. 1229. It was as if his comments were a soccer ball, passed from one player to the next, with Jennings the goalkeeper constantly bracing to block a shot that would surely come at her.
 Jennings tried hard to "stay out of [Dorrance's] radar" and thereby avoid his probing and indecent comments. J.A. 1242. She avoided the young women who were Dorrance's "main targets" and refused to respond when he inquired about her weekend with her boyfriend while he (Dorrance) was discussing another player's weekend "shag fest." J.A. 1250. But she could not avoid this environment altogether without skipping warm-up, practice, and other team gatherings. She could not dictate which players Dorrance targeted and when. Jennings was always within Dorrance's range and reasonably feared being his next target, a fear that materialized when he asked "Who are you fucking?," J.A. 1330, and "What about Trim'n?," J.A. 1252.
 Moreover, Dorrance's remarks were not made any less offensive because they related to consensual sexual activities. The majority concludes that the remarks "hardly painted women in a sexually subservient, negative, or demeaning light." Ante at 273. Comments can be sexually hostile and abusive regardless of whether they portray women as sexual prey or as sexual predators, as sexually subservient or as sexually dominant. Asking a player who her "fuck-of-the-hour" is, or whether she knows the names of her many conquests or just takes numbers, is disrespectful, degrading, and abusive — especially coming from a much older and more powerful male coach. J.A. 1223. These questions, although focused on consensual sex, nonetheless humiliated some of the women because it portrayed them as being sexually promiscuous. Indeed, on some (albeit rare) occasions, Dorrance would go so far as to call a player a "slut" in front of the team. J.A. 1251. While not always portraying women in a "sexually subservient... light," ante at 272, Dorrance's remarks were no less degrading because of that. See generally Annmarie Pinarski, When Coaches "Cross the Line": Hostile Athletic Environment Sexual Harassment, 52 Rutgers L.Rev. 911, 926-31 (2000) (surveying sociological and theoretical research). A reasonable jury could find that Dorrance's constant comments and questions about consensual sex contributed to a hostile environment.
 Jennings was not alone in finding Dorrance's remarks offensive, although the majority contends otherwise. While some teammates were "wide open" about their personal lives and sexual activities, others were less vocal and more reserved, preferring total privacy in these areas. J.A. 1053-54. Steelman was "shocked" that Dorrance encouraged and instigated the discussions about sex; she felt "very uncomfortable with his sexually charged environment," and she "would frequently [go] home crying as a result." J.A. 1452. Dorrance's comments visibly upset and angered other players as well. One, who was constantly portrayed by Dorrance as sexually promiscuous, would say through tears, "What the hell is [Dorrance] doing saying that?" and "I can't believe he would say that. I never do that." J.A. 1239. Still another cried because Dorrance focused on her breasts (her "rack," as he put it), saying that she "[could]n't believe him." J.A. 1270.[2] Evidence that other players shared Jennings's humiliation and discomfort indicates that she was objectively reasonable in finding Dorrance's comments offensive and humiliating. Cf. Hayut, 352 F.3d at 747 (characterizing reactions of plaintiff's peers to conduct directed at plaintiff as "significant to the mandated objective analysis" of whether conduct was sufficiently severe to be actionable under Title IX).
 Moreover, just because some of the young women willingly and openly discussed their sexual activities among themselves does not mean they were comfortable having those discussions with Dorrance. Contrary to the majority's suggestion, there is nothing "telling" about the fact that Jennings "does not appear to object to some of her teammates talking about their sex lives." Ante at 272. What is telling is that she objects to Dorrance's constant and open discussion about the players' sex lives. Dorrance was not simply one man outnumbered by twenty-six women. He was a forty-five year-old man probing into the sexual activities of young women, some of whom, like Jennings, were as young as seventeen. As the coach, he controlled everything: team membership, scholarship eligibility, playing position, and playing time. He was in fact more than a regular college coach; he was and still is the most successful women's soccer coach in U.S. history and a former national team coach. As such, he exercised tremendous power over his players' soccer careers at UNC and beyond.
 The players were acutely aware of Dorrance's power and feared his punishment should they complain. Even though some players felt discomfort, humiliation, or disgust because of Dorrance's conduct, they were afraid to object. As Jennings put it, "[H]ow do you say anything [to stop him]." J.A. 1290. "If you are submissive, you are fine," J.A. 1227, but if you are not, "[y]our career goes — you ... lose your playing time. You are stuck between a rock and a hard place." J.A. 1290. According to Keller, Dorrance's affectionate touching and questioning about sex "made [her] skin crawl" and made her "fe[el] dirty," J.A. 1145, yet she "didn't want to tick him off to a point ... where he would take it out on [her] by not playing [her]." J.A. 1120. Keller thus "felt the pressure" to give in to some degree and answer some of Dorrance's vulgar questions. J.A. 1120.
 The unequal power relationship between Dorrance and his players, and his ability to punish players who were not submissive, serve to make his comments about sex all the more severe and hostile. See Davis, 526 U.S. at 653, 119 S.Ct. 1661 (noting that relationship between harasser and victim necessarily affects whether conduct creates a hostile environment in violation of Title IX); Crandell v. New York Coll. of Med., 87 F.Supp.2d 304, 319 (S.D.N.Y. 2000) (denying summary judgment motion in part because "unequal power relationship" between harasser and victim could support a jury finding of sexually hostile environment). The majority discounts this power differential by suggesting that the more encompassing, "more informal [or] casual" relationship between a college coach and his athletes may serve to prevent the coach's profanity, touching, and personal questions from "cross[ing] the line separating `the merely vulgar and mildly offensive' [and] `the deeply offensive and sexually harassing.'" Ante at 274, 275; see also ante at 274 (stating that "[w]e are not examining the atmosphere in a typical university classroom with a typical university instructor or even the atmosphere in a typical workplace").
 It is true that college coaches spend long hours (even time on the road and in hotels) with their athletes, become involved in matters personal to the athletes from diet to restrictions on social life, engage in "hands-on" demonstrations in practice, massage stiff or injured muscles, and celebrate by exchanging high-fives and hugs. See ante at 274. Indeed, coaches and athletes can spend over a third of their waking hours together, including one-on-one contact and hours of unstructured "downtime" that fosters familiarity and close relationships. Nancy Hogshead-Makar & Sheldon Elliot Steinbach, Intercollegiate Athletics' Unique Environments for Sexual Harassment Claims: Balancing the Realities of Athletics with Preventing Potential Claims, 13 Marq. Sports L.Rev. 173, 176-77 (2003). This more informal atmosphere can, as the majority suggests, serve to normalize conduct, such as cursing or touching, that would be inappropriate in the more formal setting of the classroom or office. On the other hand, the same informal sports setting, coupled with the coach's intensely personal yet authoritative relationship with his athletes, may enhance the potential for sexual harassment. See, e.g., id. (noting that a coach's "special authority" over athletes and frequent one-on-one contact "amplify the potential for harassment").
 Jennings proffers facts that, if believed, show that Dorrance took advantage of the informal atmosphere as well as his position of power to cross over from routine teasing into real sexual harassment. Dorrance developed an intensely close and controlling relationship with many of his athletes. Part of this control was knowing the intimate and even humiliating details of his players' lives. According to Jennings, Dorrance knew about his players' sexual relationships and "kn[ew] who does drugs... who has the drinking problems ... who has the eating disorder. And if you don't support him, then he holds it over your head. [He] is very manipulative." J.A. 1223. He held himself out as a "father figure," encouraging his players to confide in him fully. J.A. 1325. Yet in return he asked questions of the sort that fathers do not typically ask: "Who are you fucking?" or "Who is your fuck of the hour?" J.A. 1223, 1330. As Keller put it, "It's just kind of sick [that] ... someone that you think is more of a father figure to you [is] telling you they want to watch your friend have sex." J.A. 1069. Dorrance would gain his players' trust only to exploit or betray it later, humiliating them one-on-one or in front of teammates.
 In this sexually charged atmosphere, Dorrance's comment to a trainer that he wanted to have an "Asian threesome" with two Asian players was particularly troubling to Jennings. It revealed that Dorrance had more on his mind than simply teasing or jesting with his players. It confirmed that he saw at least some of them as sexual objects. The comment exacerbated Jennings's otherwise reasonable anxiety over whether and when she would be Dorrance's next target for a degrading question or comment.
 Jennings's turn came during a fall 1996 tournament, when Dorrance met with her one-on-one in his dim hotel room, bed unmade, and asked her, "Who are you fucking?" As her coach, Dorrance was certainly free to inquire into Jennings's general social life and how she managed her time, especially because he was concerned about her grades. But this question had no legitimate place in the inquiry. Its aggressive tone, combined with the setting (alone in confined quarters) and the overall circumstances (Dorrance's pattern of sexually aggressive questioning and his power over his players) served to intensify an already hostile environment regarding matters of sex.
 The majority suggests that Jennings's forceful reply relegated Dorrance's question to the benign "inappropriate" category. It concludes that Jennings's response, "None of [your] God damn business," J.A. 1331, "undercuts the notion that [Dorrance's] age and power (as her coach)" put the question in the sexual harassment category. Ante at 273. Jennings's response did not equalize the power imbalance, however. Dorrance was still her older male coach, the one who controlled her team membership and playing time; Jennings was still his subordinate, "taken [a]back" by his intrusive question and feeling "very uncomfortable" and eager to end the inquiry. J.A. 1331. Her response indicated her indignation and discomfort. It did not neutralize Dorrance's offense or immunize his conduct. A rational jury could find that Dorrance's question constituted sexual harassment, particularly in light of his pattern of asking many of his players the same sort of question.
 In sum, Jennings has proffered sufficient facts for a jury to find that Dorrance's conduct was sufficiently severe or pervasive to create a sexually hostile environment. First, at least once or twice a week when the soccer team was together, Dorrance would get involved in — and encourage — discussions about his players' sex lives. Second, Dorrance himself regularly made indecent and inappropriate comments. In front of the team he constantly asked certain players questions, such as: Who is your "fuck of the minute"? J.A. 1237. "[Are you] going to have sex with the entire lacrosse team?" J.A. 1127. Are you going to have a "shag fest" when your boyfriend visits? J.A. 1248. Are you "going to fuck him and leave him"? Id. Dorrance's constant and vulgar prying into his players' sexual activities made several of them uncomfortable, on occasion driving them to tears. Nonetheless, these players often felt pressured to answer his questions and endure his comments without protest, fearing that any other course would provoke some form of retaliation from him. Third, Dorrance displayed overt affection for one player and told her that he would like to be a "fly on the wall" the first time her roommate (and teammate) had sex. J.A. 1069. He told a trainer (in a conversation overheard by Jennings) that he would like to have group sex with his two Asian players. Fourth, Dorrance manipulated his players' trust. He portrayed himself as a father figure, encouraging them to confide in him about all aspects of their lives. Yet he often misused personal information to degrade and humiliate a player in front of the entire team. Fifth, in light of this atmosphere Jennings had every reason to believe that she would become the target of Dorrance's inappropriate attention. When Jennings did get the question, "Who are you fucking?", it was still another piece of Dorrance's pattern of harassment. In short, there is easily a jury question here.
 C.
 Jennings either presents facts sufficient to establish or to raise a jury question on the other elements or sub-elements of her Title IX claim. First, it is undisputed that she was a student at UNC, an institution receiving federal funds. Second, Jennings proffers evidence that Dorrance's persistent subjection of the young women to talk about sexual matters (the discrimination or harassment) was based on their sex (done because they were women). Dorrance claimed to be the young women's "father away from home," J.A. 1329, yet exploited their trust by prying into their sex lives in team settings and using what he learned to demean them because of their sex. See Ocheltree, 335 F.3d at 331-33 (concluding that it was reasonable for jury to find that harassment was "because of sex" because conduct was "intended to provoke [plaintiff's] reaction as a woman," that is, to make her uncomfortable and self-conscious because of her sex). Third, Jennings testifies that Dorrance's conduct caused her severe discomfort and emotional distress that in turn caused her grades to suffer and had a negative impact on her participation in the women's soccer program. This testimony, when combined with the evidence of her substandard grade point average, creates a triable issue of fact as to whether Dorrance's conduct unreasonably interfered with her educational progress and soccer participation. See, e.g., Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 76 (2d Cir.2001) (finding that plaintiff's testimony that "it [was] almost impossible for [her] to do [her] work without getting upset" created triable issue of fact regarding unreasonable interference).
 Fourth, Jennings provides a basis for imputing liability to UNC for Dorrance's conduct. She proffers evidence that the school had actual notice of the discrimination and made an inadequate response. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). In particular, Jennings's facts show that University officials with authority to address the discrimination and to institute corrective measures had actual knowledge of Dorrance's misconduct and acted with deliberate indifference toward it, effectively causing the discrimination. See Baynard v. Malone, 268 F.3d 228, 237 (4th Cir.2001) (citing Gebser, 524 U.S. at 290, 118 S.Ct. 1989). A reasonable jury could conclude that Ehringhaus, the University's highest-ranking lawyer and an official responsible for fielding sexual harassment complaints, received actual notice of Dorrance's misconduct during her fall 1996 meeting with Jennings. Further, a jury could find that Ehringhaus acted with deliberate indifference by insisting that Dorrance was a "great guy" and then "shov[ing] [Jennings] out the door." J.A. 1342. Ehringhaus's only response — suggesting that Jennings "work it out" with Dorrance — was patently inadequate. J.A. 1341. Jennings chose to meet with Ehringhaus precisely because she did not feel comfortable talking with Dorrance about his harassment. Indeed, the University's sexual harassment policy encourages a student to "resolve the matter with the administrative official most directly concerned, excluding the person accused of sexual harassment." J.A. 924 (emphasis added). Pushing Jennings back toward Dorrance thus appears "clearly unreasonable in light of the known circumstances," which amounts to deliberate indifference. Hayut, 352 F.3d at 751 (citing Davis, 526 U.S. at 648, 119 S.Ct. 1661) (internal quotation marks and additional citation omitted). The University's ultimate reprimand of Dorrance, which came roughly a year and one-half later, would also allow a rational jury to find deliberate indifference because the reprimand "only follow[ed] after a lengthy and unjustified delay." Id. (internal quotation marks and citation omitted).
 Jennings has proffered sufficient facts to meet each element of her Title IX claim against the University. This claim should therefore survive summary judgment.
 III.
 Jennings has triable § 1983 claims against Dorrance and Ehringhaus premised on her Fourteenth Amendment equal protection right to be free from sexual harassment in educational settings. See Hayut, 352 F.3d at 743-44. Here, as to Dorrance, Jennings must show that his harassment was "because of sex" and was sufficiently severe or pervasive to interfere unreasonably with her educational progress or activities. See, e.g., Beardsley v. Webb, 30 F.3d 524, 527-29 (4th Cir.1994); Hayut, 352 F.3d at 743-49. Jennings satisfies these requirements for the reasons mentioned in my discussion of her Title IX claim. To make out her § 1983 claim, Jennings must also show that Dorrance was acting "under color of law" at the time that he harassed his women soccer players. Holland v. Rimmer, 25 F.3d 1251, 1256 (4th Cir.1994). "`State employment is generally sufficient to render the defendant a state actor,'" and a defendant in a § 1983 suit necessarily "acts under color of state law when he abuses the position given to him by the State." West v. Atkins, 487 U.S. 42, 49-50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). As a coach employed at a state university, Dorrance enjoyed great authority over his student athletes with respect to team membership, scholarship eligibility, and playing time. If he misused this authority, he necessarily acted under color of law for purposes of § 1983. See, e.g., Hayut, 352 F.3d at 744 (citing cases). For these reasons, Jennings's 1983 claim against Dorrance for sexual harassment should survive summary judgment.
 Jennings's related § 1983 claim against Ehringhaus should likewise go forward because Jennings proffers evidence that Ehringhaus, as an administrative official with authority to take action against Dorrance, failed to act and thereby tacitly authorized Dorrance's sexual harassment. See Baynard, 268 F.3d at 235. More specifically, Jennings's evidence would allow a jury to find that Ehringhaus had actual knowledge of Dorrance's misconduct; that her response was "so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and that there exists "an affirmative causal link" between Ehringhaus's inaction and Jennings's constitutional injury. Id. (citing Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.1994)). Ehringhaus is therefore not entitled to summary judgment on Jennings's § 1983 claim against her for supervisory liability.
 Dorrance and Ehringhaus argue that they are entitled to qualified immunity on the § 1983 claim. Because the district court did not address this issue in its summary judgment ruling, I would decline to consider it on appeal and would instead allow the district court to decide it in the first instance on remand. See Brown v. United States, 851 F.2d 615, 620 (3d Cir. 1988) ("[A]lthough it is within our power to do so, it would be inappropriate for us to decide this [qualified immunity] question on appeal, even if the record provided a sufficient basis for its resolution," because the district court had not yet addressed or ruled upon it.).
 IV.
 Jennings's case opposing summary judgment is made much easier because Dorrance does not deny all wrongdoing. Dorrance and the University admit that he participated in group discussions with women's soccer team members about their sexual activities. While Dorrance claims that he was only teasing or jesting, both he and the University admit that his actions were "altogether inappropriate" and "unacceptable." J.A. 1531. Dorrance and the University apologized to Jennings, and the University warned Dorrance that it was "inappropriate for [him] to have conversations with members of [his] team (individually or in any size group) regarding their sexual activity." J.A. 1533. To these damning admissions, Jennings adds evidence that Dorrance frequently participated in discussions with his team about sex, that his comments and questions were graphic, indecent, and probing, and that she and several of her teammates felt humiliated and degraded. The University knew what Dorrance was doing and failed to take prompt action to stop it. Jennings has therefore proffered sufficient facts to demonstrate that there is a genuine need for a trial on her Title IX case against the University and her § 1983 claim against Dorrance and Ehringhaus.[3] I respectfully dissent for these reasons.
 Notes:
 
 
 [1]
 The majority points out that Jennings and Keller were teammates for only one year,ante at 277, and that Steelman joined the team a year before Jennings did, id. at 277. These timing circumstances, the majority argues, render irrelevant any parts of Keller's and Steelman's testimony that recount Dorrance's sexual harassment during the period leading up to August 1996, when Jennings joined the team. This testimony, however, is relevant proof of the (sex-based) hostile environment into which Jennings was introduced. See Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir.1993) (stating that the factfinder may consider "the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs"). In any event, much of Jennings's evidence concerns harassment that occurred in her presence during her two years on the team.
 
 
 [2]
 The majority argues that Jennings is simply offering "opinion testimony" when she discusses the preceding two players, identified by the majority as A.F. and S.D., who were upset by Dorrance's commentsAnte at 277-278. Jennings's testimony, however, includes accounts of these players' physical reactions. One "didn't look happy" and cried when she discussed Dorrance's repeated claims that she was promiscuous. J.A. 1241-42. The other had a "disgusted look ... an upset look on her face" when she expressed incredulity at Dorrance's remarks about the size of her breasts. J.A. 1271. Although these two players have since signed affidavits saying that Dorrance never made unwelcome or offensive comments to them, there is nevertheless a material factual issue about their reactions at the time in question.
 
 
 [3]
 I agree with the majority's decision to affirm the grant of summary judgment in favor of the remaining defendants and in favor of Dorrance on Jennings's common law claim for invasion of privacy